[No. B021226. Second Dist., Div. Seven. Nov. 23, 1987.]

FRED C. SMITH, Plaintiff and Respondent, v.
BROWN-FORMAN DISTILLERS CORPORATION et al.,
Defendants and Appellants.

504

508

COUNSEL

O'Melveny & Myers, Richard C. White and Douglas E. Dexter for Defendants and Appellants.

Edgar R. Bardin, Lascher & Lascher and Edward L. Lascher for Plaintiff and Respondent.

## OPINION

**LILLIE, P. J.**—Defendants[1] appeal from a judgment on special verdict in favor of plaintiff and against defendant Brown-Forman Distillers Corporation (Brown-Forman) for $230,562 compensatory damages plus $250,000 punitive damages upon findings that plaintiff resigned from employment with Brown-Forman as a result of defendant's requirement that he commit a crime as a condition of employment. On appeal from the judgment, Brown-Forman challenges the sufficiency of the evidence to support the jury's findings on liability and damages, and claims the court erred in instructing the jury on constructive wrongful discharge and in admitting evidence.

### FACTS

In February 1984 plaintiff filed a complaint for damages against defendants asserting, inter alia, claims for constructive wrongful discharge from employment and intentional infliction of emotional distress. After a lengthy jury trial, the jury rendered a special verdict finding that defendants required plaintiff to commit a crime as a condition of his employment; that plaintiff resigned as a result of the requirement that he commit a crime; that plaintiff suffered damages of $230,562 as a proximate result of his constructive discharge; and defendants did not engage in outrageous conduct with intent to cause plaintiff severe emotional distress. The jury found defendants guilty of oppression or malice and assessed punitive damages of $250,000 against Brown-Forman and zero punitive damages against Gold and Hutchins. Judgment on the above verdict was entered only against Brown-Forman for the total sum of $480,562.

Because the parties on appeal each accuse the other of inadequate presentation of the facts in the briefs, we have read the record and present the following facts favorable to the respondent, giving him the benefit of every reasonable inference and resolving conflicts in support of the judgment. (*Vernon Fire Fighters Assn.* v. *City of Vernon* (1986) 178 Cal.App.3d 710, 718-719 [223 Cal.Rptr. 871].)

---

[1] Although the notice of appeal and opening brief state that defendants Shelley Gold and Charles Hutchins also appeal from the judgment, respondent argues correctly that no judgment was rendered against them and that Gold and Hutchins are not aggrieved parties with standing to appeal. (Code Civ. Proc., § 902.) In reply, appellants' attorney states, "Brown-Forman does not oppose Smith's motion to dismiss . . . Shelley Gold and Charles Hutchins from this appeal . . . ." Accordingly, the appeals of Gold and Hutchins are dismissed. Hereafter, "defendant" shall refer only to Brown-Forman.

The notice of appeal also states that defendants appeal from the order denying the motion for judgment notwithstanding the verdict. Inasmuch as defendants' briefs do not address this ruling we deem the appeal therefrom to be abandoned. (*Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 859, fn. 13 [176 Cal.Rptr. 239].)

In February 1983, at the age of 66, plaintiff resigned from employment with Brown-Forman under circumstances which plaintiff claims constitute a constructive wrongful discharge. In 1963, when he was 45 years old, plaintiff was hired by Brown-Forman as a sales trainee and was assured then that he could work until the mandatory retirement age, then age 65 and later changed to age 70. Brown-Forman was and is a distiller of various liquor products. In California, the liquor industry is structured in a three-tiered system pursuant to which the distiller or supplier sells to the wholesaler (or distributor), and only the distributor is allowed to sell to the retailer. The Federal Alcohol Administration Act passed in 1933 and regulations promulgated under the act and administered by the Bureau of Alcohol, Tobacco and Firearms (B.A.T.F.) govern the industry and prohibit a distiller from giving away to the retailer anything of value, including goods and services, causing an exclusion of a competitor's products. Under the federal laws, furnishing free labor to a retailer to get prime shelf space belonging to another distiller is illegal. The California Alcoholic Beverage Control Act also regulates the liquor industry and pursuant to regulations enforced by the Department of Alcoholic Beverage Control (A.B.C.), a distiller is allowed to have displays in retail stores, move its own products on the retailer's shelves at the request of the retailer, and rotate brands in the storeroom so the product does not get old. A distiller, however, is forbidden under California law to move other companies' products or to even price mark its own brands on the retailer's premises; handling other companies' products is a misdemeanor punishable by fine or six months in jail.

In 1971 plaintiff was promoted to chain store manager in Southern California. From 1976 to April 1981, his immediate supervisor was Tom West, the state sales manager of Southern California. West told all his employees to carry with them a September 1976 letter from the company's president, Mr. Brown, in which Brown directed all employees to comply with all federal and state regulations and laws relating to pricing and trade practices upon penalty of being terminated from employment. No specific laws were set out in the letter, but employees were invited to address questions about a particular law to the company's legal department in Louisville, Kentucky. Before 1983, Brown-Forman had no manual that set out what its employees could or could not do under the laws.

Under West, plaintiff never attended "sets" or "resets" at retail stores because West believed they were illegal. At a set, a retailer would place liquor on the shelves of a new store according to a schematic and at a reset, the retailer would change the schematic and move products to different locations. At a set or reset, an employee of the retailer would usually be the leader or person in charge and he would direct the employees of the various

distillers and distributors attending the set/reset. The distillers had no control over their activities when they attended a set or reset and the retailers would have them sweeping floors, loading beer boxes and pricing items. It was common knowledge in the industry that at a set or reset, everybody did everything, including handling other companies' products, although it was also common knowledge that such conduct may be a violation of law.

In late 1980, Brown-Forman developed a five-year plan for its Southern California area pursuant to which one of plaintiff's key tasks was to attend sets and resets in order to ensure that defendant's products would get prime positions on the store shelves. At that time other distillers were contacting the chain stores and going to sets and resets. West refused to direct his employees to attend and one of his reasons for resigning from Brown-Forman in April 1981 was because he was opposed to sets and resets. In 1981, Charles Hutchins replaced West. Hutchins told plaintiff to go out and contact all chain store managers and offer them merchandisers to do sets, resets, and displays. When plaintiff presented the program to the liquor buyer from Lucky Markets, he told plaintiff that it was illegal and he would have no part of it. In May 1982, plaintiff reported the comment to Hutchins's supervisor, Mr. Gold, regional sales director and vice-president of B-F Spirits Limited, a division of Brown-Forman. In July 1982, Felix Lopez became chain store manager and supervised Jim Riggio and plaintiff, whose title became chain store supervisor. In July, at the request of Hutchins, plaintiff and another Brown-Forman employee attended a reset at a Von's store in Tarzana where they set up and priced the beer box section in the liquor department. Brown-Forman does not sell beer. Plaintiff reported these activities to his supervisor in his weekly report. On October 6, 1982, Lopez directed plaintiff to attend a reset in Lancaster, where he tore down and washed shelves, took various brands of liquor off the shelves, priced them, and swept up the floor. Believing that the reset in Lancaster was illegal, plaintiff told Hutchins, who responded that it was included in his key tasks, he had to attend, and that Gold was very high on sets and resets. From July to late 1982, Lopez also handled other companies' products at sets and resets and reported such to Hutchins four, five or up to ten times. James Riggio, a Brown-Forman sales representative, attended 25 or 30 sets in a 1-year period, and was told by Hutchins that because it was part of his key tasks, it was alright for him to handle other distillers' brands.

Plaintiff complained many times to Lopez about the illegality of their activities at sets and resets and told him that he was worried about getting caught and losing his job and benefits. Lopez told him, "Let's not get caught"; he did not tell plaintiff not to handle other companies' products. At a meeting in October 1982, plaintiff told Hutchins of his fears of getting arrested if there was a raid by the A.B.C. and plaintiff asked for a letter

from Gold regarding the legality of sets and resets. Hutchins replied he would discuss it with Gold. Riggio and plaintiff also suggested Hutchins contact the A.B.C. about the labor furnished at sets and resets, to which Hutchins replied that it was legal as long as they handle their own products. Hutchins never did contact the A.B.C. or the company's legal department before plaintiff left in February 1983. Hutchins knew from reports coming back to him that his employees were directed and controlled by retailers to sweep floors and load iceboxes and beer boxes, but only told his employees that they should not do it. Hutchins did not instruct his employees on the federal or state laws, nor did he inform any of the retail chain stores that his employees could not sweep the floors or touch other companies' products. Although Gold admitted being aware of plaintiff's complaints and request for a letter, Gold did not consult anyone higher up in the company about the request. As to plaintiff's complaints, Gold responded that they would have no problem as long as they handled only their own product. Gold told plaintiff that he had checked with the A.B.C. and sets and resets were legal. Plaintiff was directed to attend sets in December 1982 and January 1983 where he handled other companies' liquor.

Although no employee had been arrested at a set or reset and no Brown-Forman employee had been fired for his activities at a set, plaintiff was not sure that Gold was correct as to the legality of the sets, so in early February 1983 he anonymously called the A.B.C. and was told by an agent that handling other companies' products is a misdemeanor. When plaintiff informed Hutchins of his conversation with the A.B.C., Hutchins gave him the choices of doing his key tasks, including sets and resets and working until he was 70, or not doing his key tasks, for which he could be terminated, or if he got caught doing illegal activities, he could also be terminated, or he could retire or resign. The next week, plaintiff told Hutchins he was going to retire as he couldn't take it any more. Hutchins called plaintiff into his office, dictated a letter of resignation, and had plaintiff sign it.

## I

### SUFFICIENCY OF THE EVIDENCE

Appellant contends that because the evidence is not in dispute that Brown-Forman consistently instructed respondent to obey the law, it can be determined as a matter of law that respondent was not required to violate the law as a condition of employment and there was no constructive discharge in violation of public policy under *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178 [164 Cal.Rptr. 839, 610 P.2d 1330]. In *Tameny*, the court held that "an employer's authority over its employees does not include the right to demand that the employee commit a criminal

act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." (27 Cal.3d 167, 178.) ▮ A coerced resignation is tantamount to a discharge. (*Keithley* v. *Civil Service Bd.* (1970) 11 Cal.App.3d 443, 449 [89 Cal.Rptr. 809].) "Though not always employing precisely the same language, most courts seem to have adopted the rule that a constructive discharge occurs in this context when an employer deliberately causes or allows the employee's working conditions to become 'so intolerable' that the employee is forced into an involuntary resignation." (*Beye* v. *Bureau of National Affairs* (1984) 59 Md.App. 642 [477 A.2d 1197, 1201]; see also *Wagner* v. *Sanders Associates, Inc.* (C.D.Cal. 1986) 638 F.Supp. 742, 745.)

▮ In the instant case the jury specifically found that defendant required Smith to commit a crime as a condition of his employment. Sufficient evidence and inferences therefrom support such a finding and appellant's argument completely ignores reasonable inferences from facts in the record which lead to such a finding. The jury could reasonably have inferred that defendant knew its competition was violating the law at sets and resets and knew its employees were also being asked to engage in illegal activities, but still decided to send them out to sets in order to maintain good shelf position for its products. Although defendant may have paid lip service to a policy of following the laws and regulations, it really intended its employees to do whatever the retailer requested, whether legal or not, and to this end it did not instruct its employees on the law nor have a manual, training program, or other procedure to instruct them or to give them something to show to retailers should an employee decide to question the legality of a retailer's request for labor. Moreover, even after being informed of illegal activities by its employees, defendant did not make an effort to contact the retailers on behalf of its employees to make sure the retailers did not request anything illegal of its employees. It did not discipline or fire any employee for breaking the law and violating the purported company policy. A jury could reasonably infer from all of the above facts that defendant expected and required its employees to violate the law.

We also find without merit appellant's factual argument that, assuming he was required to violate the law, Smith's working conditions were not intolerable because he had several options available to him short of resignation and retirement: Smith could have refused the retailer's instructions to commit illegal acts, he could have utilized the company grievance procedure to bring his dilemma before people higher up in the company than

Hutchins and Gold, and he could have followed the directive in the 1976 Brown letter to contact the company's legal department. The jury, however, could have reasonably concluded that plaintiff had no other viable alternative to risking arrest other than resigning. Smith testified that if he had shown the Brown letter to a retailer at a set or reset and refused to follow the retailer's directions, his products would have been "out on the curb." Before resigning, Smith did seek to bring his problem to the attention of those in the company above his immediate supervisor by requesting a letter from Gold. Further, his request that Hutchins contact the A.B.C. was perhaps a more direct way to obtain information about California laws than trying to contact the company's legal department in its corporate headquarters in Kentucky.

Appellant also contends that because Smith applied for social security in late 1982, he voluntarily retired and was not constructively discharged. This is a factual argument that was resolved against it by the jury, which made a special finding that Smith did indeed resign as a result of a requirement that he commit a crime.

## II

### SPECIAL INSTRUCTION No. 25

■ Appellant contends that the court erred in instructing the jury pursuant to special instruction No. 25, requested by plaintiff, that "[r]equiring an employee to violate the law as a condition of employment constitutes a constructive discharge." Appellant claims the instruction removed the issues of intolerability and causation from the jury. Although we agree that the instruction may be somewhat awkwardly phrased, under the facts of the instant case it was not misleading nor did it remove any issues from the jury.

■ In determining whether jury instructions are in error or prejudicially ambiguous, the instructions must be considered as a whole. (*Pacific-Southern Mortgage Trust Co.* v. *Insurance Co. of North America* (1985) 166 Cal.App.3d 703, 714 [212 Cal.Rptr. 752].) An ambiguity in one instruction may be cured by another more explicit instruction which correctly states the applicable legal principles. (*Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 630 [124 Cal.Rptr. 143].) ■ Each party must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion. (*West* v. *Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 864 [220 Cal.Rptr. 437].) Neither a trial court nor a

reviewing court is obligated to seek out theories which a party might have advanced or to articulate for him that which he has left unspoken. (*Ibid.*)

 In this case, the pertinent instructions on constructive discharge state as follows: "In this case Plaintiff must prove that he was required to violate a criminal statute as a condition of his employment, and he was constructively discharged as a result of refusing to violate the statute. . . . [¶] An employer may not require an employee to perform illegal acts of any nature as a condition or requirement of that employee's employment or continued employment. An employer may not terminate an employee for the employee's refusal to perform illegal acts. [¶] In this case, if you find that Plaintiff retired from his employment with Defendant . . . you must presume that his retirement was voluntary unless Plaintiff proves by a preponderance of the evidence that Defendants constructively discharged him by deliberately making his working conditions so intolerable that Plaintiff was forced to retire. [¶] An employer acts deliberately when it knowingly permits conditions of employment to become so intolerable that the employee is forced to resign. [¶] If an employer forces an employee to resign and/or if the employer makes conditions of employment so difficult for the employee that the employee is forced to leave the employment, then that employer has discharged or terminated the employee. [¶] Requiring an employee to violate the law as a condition of his employment constitutes a constructive discharge of that employee."

As to the issue of intolerability, it is clear from the parties' discussion of the instructions with the court that the court determined, without expression of opposition by anyone, that "to require an employee to violate a law is, itself, outrageous conduct to amount to a constructive discharge. Let me drop the phrase 'outrageous conduct.' It violates public policy so as to constitute a constructive discharge." At one point in the discussion, defense counsel basically agreed with the court's legal analysis, but suggested other language: "If some form of special 25 is to be left in—and I respectfully disagree that it should be—it seems that it should say something like requiring employee to violate the law as a condition of employment constitutes an intolerable working condition . . . ." Defense counsel's primary objection to special instruction No. 25 was that it was unnecessary because two other instructions already covered the elements of a constructive discharge. The court disagreed, explaining that one of the other instructions focused on the burden of proof, without defining a constructive discharge, and the other instruction only stated the limitation that an employer could not discharge an employee who refused to perform illegal acts. In defense counsel's argument to the jury, he did *not* argue that requiring an employee to violate the law was itself insufficient to meet the element of intolerability. Thus, under the circumstances of this case, the issue of intolerability was indeed before

the jury because it was equated with the issue of whether defendant required Smith to violate the law as a condition of employment. To the extent that Brown-Forman suggests on appeal that such an equation is erroneous, it has not met its burden of showing error with any authority.

We also disagree with appellant's contention that special instruction 25 removed the element of the cause of Smith's resignation from the jury. A reasonable jury would have understood the instruction, when read in the context of the other instructions as further defining an intolerable working condition and not as removing one of the elements as to which plaintiff had the burden of proof. Any confusion that may have been engendered by the instruction was certainly not prejudicial because the jury did specifically find on the issue of causation in its special verdict, thus impliedly rejecting the defense position that plaintiff resigned voluntarily or for reasons independent of attendance at sets and resets.

## III

### PUNITIVE DAMAGES

We find without merit appellant's contention that there was insufficient evidence of conscious disregard of rights to support the award of punitive damages. An award of punitive damages requires a plaintiff to prove that defendant was guilty of oppression, fraud, or malice, and acted with an intent to vex, injure, or annoy, or with a conscious disregard of plaintiff's rights. (*Fleming* v. *Safeco Insurance Co.* (1984) 160 Cal.App.3d 31, 43 [206 Cal.Rptr. 313].) Conscious disregard of rights is conduct by a defendant who is aware of the probable dangerous consequences of such conduct to plaintiff's interests and wilfully and deliberately fails to avoid those consequences. (*Flyer's Body Shop Profit Sharing Plan* v. *Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1155 [230 Cal.Rptr. 276].) In the instant case, the evidence establishes that both Gold and Hutchins were aware of Smith's complaints of illegal activities at sets and resets and the dilemma facing Smith as well as other employees. Yet Brown-Forman did nothing to ensure that its employees were adequately informed of the law or to ensure that such illegal activities would not occur. A reasonable inference from the record is that Brown-Forman pursued a course where it knowingly placed its employees in a situation where they would engage in illegal activities because it wanted to obtain the competitive benefits of such illegal conduct, yet at the same time by paying lip service to a contrary policy, it could disavow any responsibility for such illegal conduct. Thus, it was protecting itself at the expense of its employees. A jury could reasonably conclude this constitutes conscious disregard of employee rights.

## IV

### COMPENSATORY DAMAGES

The jury awarded plaintiff $230,562 in compensatory damages. The special verdict reads in pertinent part: "*Question No. 3*. What is the amount of money damages suffered by plaintiff as a proximate result of his constructive discharge? In computing this amount you should consider the salary and benefits plaintiff would have earned since the date of his discharge, plus interest. From that amount you should deduct pension and social security benefits, and any other money plaintiff could have earned through reasonable efforts from other employment since his discharge. Answer: $230,562."

Plaintiff testified, without any evidence to the contrary, that as a result of the termination he had lost, out-of-pocket, up to the time of trial a total of $200,794.90, which reduced by $47,086.96 of pension and social security benefits, came to a loss of $153,708. ██ ██ Appellant's attack on the damages verdict is two-fold: (1) it argues the figure of $153,708 is simply Smith's conclusory unsubstantiated opinion and (2) it claims the jury failed to correctly apply the court's instructions and misinterpreted the $153,708 to apply only to damages up to March 1985 rather than the time of trial in March 1986.

As pointed out by respondent, Smith's testimony as to his damages was received without objection and is proper evidence upon which the jury could rest its determination. The fallacy with respect to appellant's second argument is that its claim of jury misinterpretation is based on assumptions about the subjective reasoning processes of the jurors which this record neither corroborates nor proves and which cannot be used to impeach the verdict. (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 413 [185 Cal.Rptr. 654, 650 P.2d 1171].)

During deliberations the jury requested to have read to it a portion of Smith's testimony regarding the $153,708 figure. In its written request the jury mistakenly identified the date of Smith's testimony as "2-28-85" rather than 2-28-86, and asked for "breakdown on amount loss totaling $153,000 during period 2/83 - 3/85." There is no evidence, however, that after this testimony was read to them, the jury did not realize the correct date of trial and apprehend correctly Smith's testimony. Appellant argues that the award of $230,562 may *only* be explained upon a mistaken belief of the jury that the $153,708 figure applied only to the period up to March 1985, because the damages that the jury did award can be calculated by multiplying $153,708 by one-and one-half, which is precisely what the jury would have done under a mistaken belief that the above figure applied only to a

two-year period after discharge and in order to calculate damages up to the time of trial. Appellant argues also that the damages are limited to losses from the time of termination up to the time of trial rather than to February 1987, when Smith reached the mandatory retirement age of 70, because a jury instruction told the jury that "The amount of such award [of damages] shall include: The amount of money, including salary and fringe benefits, which the plaintiff would have earned from the date of his discharge through the present, less pension and social security benefits received by him and all money . . . which the plaintiff has earned from other employment. . . ."

The above instruction is an incorrect statement of the law, while a correct statement is set out in the special verdict. ■■■ The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. (*Parker* v. *Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615]; *Rabago-Alvarez* v. *Dart Industries, Inc.* (1976) 55 Cal.App.3d 91, 98-99 [127 Cal.Rptr. 222].) ■■■ In the instant case, it is clear that Smith intended to continue employment up to the mandatory retirement age of 70, which in this case would have been a year after the time of trial. There is no evidence the jury did not follow the correct instructions given in question No. 3 of the special verdict.

■■■ On appeal the reviewing court may overturn the award of damages only if the award is excessive as a matter of law or if after reviewing the record favorably to the judgment, we conclude that the award is so grossly disproportionate to the harm suffered as to raise the presumption that it resulted from passion or prejudice. (*Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, 419.) We determine every conflict in favor of the prevailing party, who is entitled to the benefit of every inference. (*Greenfield* v. *Spectrum Investment Corp.* (1985) 174 Cal.App.3d 111, 123 [219 Cal.Rptr. 805].)

■■■ Smith testified that at the time he left Brown-Forman in 1983 he was receiving $27,000 a year base pay plus bonuses; a car, including insurance payments, gas, oil, repairs, and maintenance; and health insurance. In 1982 he received bonuses totaling over $10,000 and the company paid about $9,075 for his car and entertainment. A Brown-Forman 1985 annual report to the Securities and Exchange Commission also showed that its gross profit increased over the years from 1982 to 1985. Smith also testified that he received a total of $1,440 per month in social security and pension benefits. Based on this evidence, the jury reasonably could have concluded that the

value of plaintiff's bonuses and benefits would have increased from February 1983 to February 1987. An award of damages of about $230,500 for that time period was thus not grossly disproportionate to a reasonable view of the evidence.

## V

### EVIDENTIARY RULINGS

Appellant claims as error two evidentiary rulings by the trial court admitting evidence concerning an A.B.C. enforcement action against a San Diego Liquor Barn in June 1983, about four months after Smith left Brown-Forman, and permitting Smith's counsel to cross-examine defense witness Jerry Jolly, an A.B.C. enforcement agent, as to whether his opinion of Brown-Forman's good reputation would change if he heard about several criminal actions involving Brown-Forman outside California.

### A. *A.B.C. Enforcement Action.*

Smith was allowed to read into evidence a portion of Mr. Gold's deposition testimony where he stated that it was reported to him on the day it happened that the A.B.C. came into a set at a Liquor Barn in San Diego and "everybody ran all over hell and ran out"; that the store got a letter from the A.B.C. not to allow suppliers such as Brown-Forman into the store to help with sets or resets; and following this incident, he still had his employees attend sets and resets.

Appellant contends that the last portion of the testimony about Brown-Forman's conduct after the A.B.C. action is inadmissible because evidence of arguably remedial measures taken after Smith's resignation was inadmissible in determining liability and therefore prejudicial. This objection cannot now be raised on appeal because defense counsel at first made a motion to strike such evidence and later withdrew the motion. Appellant also contends the entire San Diego incident was irrelevant and prejudicial and should have been excluded under Evidence Code section 352.

The law vests wide discretion in the trial court to decide the relevance of proffered evidence. (*Mesnick* v. *Caton* (1986) 183 Cal.App.3d 1248, 1262 [228 Cal.Rptr. 779].) The trial court is also vested with broad discretion in ruling on the admissibility of evidence. (*Aguayo* v. *Crompton & Knowles Corp.* (1986) 183 Cal.App.3d 1032, 1038 [228 Cal.Rptr. 768].) The weighing process under Evidence Code section 352 depends on the trial court's consideration of the unique facts and issues of each case, rather than

on mechanically automatic rules; the court's ruling will be upset only if there is a clear showing of an abuse of discretion. (*Aguayo, supra,* at p. 1038.)

 Appellant has not met the burden of showing an abuse of discretion. The trial court found the evidence to be relevant to the issue of level of communication among Brown-Forman managers in connection with the practice of sets and resets. The court noted that whether or not such information was reported up in the company's chain of command is a matter of some concern whose probative value outweighs the prejudicial effect because such evidence indicates whether Smith would have been reasonable in apprehending arrest or termination due to inappropriate practices at a set or reset. The fact that the event may have occurred after Smith's resignation was not critical, as the court found the event not so remote that it would not have some bearing on what may be a reasonable state of mind of an employee like Smith before his resignation. Such evidence was also admissible for impeachment of Gold, who had testified earlier that he first heard anything relating to the fact that his employees were handling other companies' products "after this lawsuit was filed [February 1984], but certainly after Mr. Smith left," and that the 1976 Brown letter expressed the policy of the company, which policy was enforced. The evidence concerning the San Diego incident tends to impeach Gold's testimony that he heard of his employees handling other products only after this lawsuit was filed and that Brown-Forman enforced the policy set out in the Brown letter. Finally, appellant's arguments on the issue of prejudice to the jury are unpersuasive because no reasonable jury could have concluded Smith was actually influenced by an event occurring months after his discharge, nor could the jury have inferred that criminal arrests occurred in San Diego because subsequent testimony by an A.B.C. agent established that no one involved in the incident was given a criminal citation or arrested.

## B. *Cross-examination of Jerry Jolly*

 Defense counsel elicited on direct examination of Jerry Jolly that Brown-Forman had a good reputation with the A.B.C. as to business practices. On cross-examination, Smith was allowed to ask Jolly what his opinion of Brown-Forman's reputation would have been if he had heard about several criminal actions against it in 1976, 1977, and 1980 in other states. Jolly responded in essence that he had not heard of the violations and had he known of them, he could have changed his opinion, based upon the particular facts in the cases. Defense counsel objected on the grounds of relevancy and that the questions assume facts not in evidence. Appellant contends that the court committed "an error in law and abuse of discretion" in allowing the questions because they did not test Jolly's familiarity with Brown-Forman's reputation in California and were not asked for the

purpose of obtaining answers but to bring criminal allegations before the jury in order to portray the company as an habitual criminal violator.

██ A cross-examiner may bring out all the facts within the knowledge of a witness involving things testified to on direct and which are material to a thorough understanding of the testimony, or to elicit any matter which may tend to overcome, qualify or explain the direct testimony. (*Eddy* v. *Gallaway* (1970) 11 Cal.App.3d 185, 192 [89 Cal.Rptr. 491].) Cross-examination has for its first utility the extraction of such remaining and qualifying circumstances. (*Ibid.*) For example, in a criminal case where a defense witness other than the accused testifies to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness's testimony. (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) In asking such questions, the prosecutor must act in good faith and with the belief that the acts or conduct specified actually took place. (*Ibid.*) ██ In the instant case, there is no charge that plaintiff's counsel lacked good faith or did not believe that the other criminal prosecutions had occurred. Further, such questions were properly within the scope of cross-examination because they tended to place Jolly's opinion in perspective and to provide information important in weighing such opinion. Accordingly, appellant fails to show that an error of law occurred or that the court abused its discretion.

## DISPOSITION

The judgment is affirmed. The appeal from the order denying motion for judgment notwithstanding the verdict is dismissed. The appeals of defendants Gold and Hutchins are dismissed. Respondent shall recover his costs on appeal from appellant Brown-Forman.

Thompson, J., and Johnson, J., concurred.

A petition for a rehearing was denied December 15, 1987.