Filed 7/8/25  White v. Rockport Administrative Services CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| MALISSA WHITE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ROCKPORT ADMINISTRATIVE SERVICES, LLC et al.,<br><br>    Defendants and Respondents. | B330752<br><br>(Los Angeles County Super. Ct. No. 19STCV35955) |


APPEAL from orders of the Superior Court of Los Angeles County.  Douglas W. Stern, Judge.  Affirmed.

John L. Dodd & Associates, John L. Dodd; The Law Office of George Moschopoulos, George Moschopoulos; The Ryan Law Group and Andrew T. Ryan, for Plaintiff and Appellant.

Horvitz & Levy, Eric S. Boorstin and Jason Y. Siu, for Defendants and Respondents.

_____

Appellant Malissa White (White) brought an employment action against Overland Terrace Healthcare & Wellness Center, LP (Overland), and Rockport Administrative Services, LLC (Rockport). Her lawsuit fell apart in the middle of trial. After White presented her case to the jury, she abandoned one of her original causes of action. The trial court granted nonsuit as to all but one of White's surviving claims—namely, constructive termination in violation of public policy. On that claim, the jury returned a verdict for White. However, after posttrial briefing from the parties, the court determined that White had not offered sufficient evidence to prove constructive termination. Accordingly, the court granted nonsuit, judgment notwithstanding the verdict (JNOV), and/or new trial to all defendants.

On appeal, we affirm the grant of nonsuit and/or JNOV on all of White's substantive claims. White's remaining challenges are moot.

## BACKGROUND[1]

I.    *White's Employment*

Overland owned and operated Country Villa South (Country Villa), a skilled nursing facility. Rockport provided comprehensive support services to Overland; among other things,

---

[1]    Our summary of the relevant facts is drawn from White's presentation of evidence at trial, and, as required when reviewing a grant of nonsuit or JNOV, "'"'interpret[s] the evidence most favorably to plaintiff's case[,] . . . resolving all presumptions, inferences and doubts in favor of the plaintiff[.]'"' [Citation.]' [Citation.]" (*Stonegate Homeowners Assn. v. Staben* (2006) 144 Cal.App.4th 740, 746 (*Stonegate Homeowners*) [nonsuit]; *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 258–259 (*Osborn*) [JNOV].)

2

it handled accounting and billing, and investigated internal complaints made by Overland's employees.

In March 2018, White began working at Country Villa. Six months later, she became a minimum data set (MDS) nurse, responsible for preparing "assessments" to obtain Medicare reimbursement. Among other things, White ensured that Medicare forms, including the certificates used to bill Medicare for doctor visits (certificates), were filled out correctly.

White went to a three-day MDS training, which "covered Medicare, the legal aspects of what's involved in the MDS process, [and] how to complete assessments."

II.    *White Suspects Medicare Fraud*

In January 2019, White "started seeing a lot of fraudulent activity" at Country Villa. She believed that her supervisor, the director of nursing (the director), was falsifying medication requests and asking White to sign sham forms. White believed this would be "illegal" and "fraudulent." White complained to Overland and Rockport executives.

In February 2019, White received a text message from Alex Castillo (Castillo), Rockport's director of development, who claimed that a physician's assistant told him to sign four certificates for an absent doctor. Castillo's message "ang[ered]" and "scared" White, who believed that his signing the certificate would constitute "a federal crime that entitles federal jail time."

Later, White found two blank certificates that had been presigned and dated by a doctor. She also found two additional certificates on which she believed signatures had been forged. White sent multiple copies of these problematic certificates to Rockport for investigation.

In March 2019, White filed electronic complaints with the California Department of Public Health and Office of the Inspector General, alleging suspected Medicare fraud. And every week, she advised the director that "the cert[ificate]s were not done properly and the way they were done w[as] illegal[,]" only to be told that "that's the way that they had to be done."

Despite White's efforts, she felt that her working conditions had become intolerable. She was "stressed" that she "could [possibly] be criminally charged for something [she] didn't do." She felt that nothing was improving and nobody took her complaints seriously.

At the end of March 2019, the director issued White a written disciplinary warning for improper timekeeping after she failed to clock out for lunch. Although the write up did not change White's working conditions, she began contemplating resignation.

III.    *White Resigns*

On May 8, 2019, White submitted a resignation letter providing two weeks' notice. She did not mention her complaints, instead thanking the company for its "support and the opportunities [it] ha[d] provided [h]e[r] during the last year." She included the language to "be professional" and avoid being "blackballed" from future jobs, but testified that she had actually left to get away from "the illegal activities that were happening in the building."

When the director demanded that White "stop reporting her" to regulatory agencies, White recanted her first letter and quit the next day.

4

IV. *Complaint*

On October 8, 2019, White sued Rockport for constructive termination in violation of public policy, whistleblower retaliation (Lab. Code, § 1102.5) and intentional infliction of emotional distress (IIED).[2] Among other things, White sought punitive damages.

Three months later, White joined Overland as a defendant on each of her three causes of action.

White advanced the same theory of liability as to both Overland and Rockport (collectively respondents). Her constructive termination claim overlapped with her retaliation claim. White alleged that respondents forced her to participate in their scheme to commit Medicare fraud. When she refused and made complaints, they unlawfully retaliated against her, compelling her to quit her job. White's constructive termination claim thus alleged that her coerced resignation violated two fundamental public policies: (1) the "prohibit[ion] [against] an employer . . . retaliating against an employee that reports fraudulent or illegal conduct[,]" and (2) a "policy against Medicare fraud[,]" which "prevent[s] taxpayer waste."

White's IIED claim followed a similar logic. By retaliating against White for "fulfilling her ethical and legal obligations as an MDS nurse[,]" respondents acted outrageously and caused White to suffer severe emotional distress.

V. *Respondents Move for Nonsuit*

The matter proceeded to a jury trial in January 2023. After White rested her case, respondents orally moved for nonsuit as to

---

[2] White also alleged whistleblower retaliation under Health and Safety Code section 1278.5, but she voluntarily dismissed that claim before trial.

all three of her substantive claims. They also requested nonsuit on the issue of punitive damages.

The trial court granted nonsuit on IIED as to Overland.[3] It also granted nonsuit on whistleblower retaliation and punitive damages as to both respondents.

The trial court deferred ruling on the rest of respondents' nonsuit motion. This left only White's constructive termination claim for the jury.

VI. *White Attempts to Recharacterize Her Constructive Termination Claim*

The trial court's grant of nonsuit as to whistleblower retaliation weakened White's claim for constructive termination in violation of public policy, which relied in part on the allegation that respondents violated section 1102.5 of the Labor Code by retaliating against White for making lawful complaints.

Without her retaliation theory, White was left with the allegation that respondents violated public policy by committing "Medicare fraud." However, the evidence she had presented to the jury showed only that White *believed* respondents were involving her in an undefined federal crime or civil violation by incorrectly filling out certificates for Medicare reimbursement. She had not advised the jury or the trial court of any specific statute or regulation that respondents' conduct violated.

In an attempt to introduce a concrete legal reference point for her Medicare fraud theory, White proposed a jury instruction entitled "Definition of MediCare Fraud[,]" based on two specific provisions of the federal False Claims Act (31 U.S.C. § 3729

---

[3]    White abandoned her IIED claim against Rockport.

et seq.). But the trial court rejected the proposed instruction, and the jury was never instructed on the False Claims Act.

VII. *White's Constructive Termination Claim Goes to the Jury*

After the flurry of nonsuited and abandoned claims described above, by the time White's case went to the jury, her only surviving claim was for constructive termination in violation of public policy.

Among other things, the parties agreed to instruct the jury that (1) "[i]t is a violation of public policy for an employer to require an employee to engage in MediCare fraud[,]" and (2) to prove her constructive termination claim, White would have to prove that Overland and Rockport "intentionally created or knowingly permitted" "working conditions that violated public policy in that she was asked to participate in MediCare fraud[.]" The instructions did not define MediCare fraud in any way.

On January 13, 2023, the jury returned a special verdict, finding, among other things, that respondents "subject[ed] . . . White to working conditions that violated public policy as a condition of employment." It also awarded White $1,200,000 in past noneconomic damages.[4]

VIII. *The Trial Court Grants Rockport Nonsuit on Constructive Termination*

Two weeks later, after reviewing briefing on respondents' pending nonsuit motion, the trial court granted nonsuit on constructive termination as to Rockport, finding that White failed to prove that Rockport was her employer.

---

[4] Since the special verdict form held both respondents liable and does not suggest an apportionment of damages, we assume that the damages were awarded jointly and severally against both respondents.

The trial court denied nonsuit as to Overland, which had not disputed its employer status.

IX.   *Respondents Move for JNOV and New Trial*

In February 2023, respondents filed a motion for JNOV, arguing, among other things, that White did not prove her termination violated an identifiable public policy. Rockport relied on the trial court's earlier grant of nonsuit, but, in an abundance of caution, also joined Overland's JNOV motion.

In the alternative, Overland moved for a new trial, citing excessive damages.

X.   *The Trial Court Grants JNOV (as to Rockland and Overland) and New Trial (as to Overland)*

On March 22, 2023, the trial court held a hearing on the posttrial motions. After entertaining argument, the court expressed concern that White's constructive termination claim was "kind of built on a foundation of sand[,]" as the jury "had no evidence as to what would constitute" Medicare fraud.

Later that same day, the trial court granted JNOV as to both respondents. The court explained that "totally absent from the evidence in this case is any identification of any specific law . . . constitut[ing] the mandatory 'fundamental public policy'" element of White's constructive termination claim. The court ruled that failure to submit evidence on that element was "fatal to [White]'s claim."

In the alternative, the trial court granted Overland's motion for a new trial on damages, agreeing that the jury's $1,200,000 award was excessive.

XI.   *Appeal*

White timely appealed, challenging, inter alia, (1) the grant of nonsuit on constructive termination (as to Rockport), (2) the

8

grant of JNOV on constructive termination (as to both respondents), (3) the grant of nonsuit on IIED (as to Overland), (4) the grant of nonsuit on punitive damages (as to both respondents) and (5) the grant of a new trial on damages to Overland.

## DISCUSSION

I. *General Legal Principles and Standard of Review*

Typically, the only difference between a motion for nonsuit and a motion for JNOV is the time the motion is filed. In general, "if a defendant believes that the plaintiff has not presented substantial evidence to establish a cause of action, the defendant may move for a nonsuit if the case has not yet been submitted to the jury, . . . or a [JNOV] following an unfavorable jury verdict." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veteran Affairs* (1998) 67 Cal.App.4th 743, 750.)

Otherwise, motions for nonsuit and JNOV "are analytically the same and governed by the same rules. [Citation.] The function of these motions is to prevent the moving [party] from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict. [Citation.]" (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs, supra,* 67 Cal.App.4th at p. 750.)

Our "review of a grant of nonsuit is de novo." (*Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 669; see also *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 573 [same as to grant of JNOV].) However, we must "'evaluat[e] . . . the evidence in the light most favorable to the plaintiff.' [Citations.] 'We will not sustain the judgment "'unless

9

interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.'" [Citation.]' [Citation.]" (*Stonegate Homeowners*, 144 Cal.App.4th at p. 746; see also *Osborn, supra*, 5 Cal.App.4th at pp. 258–259 [same as to JNOV].)

A defendant is entitled to a nonsuit or JNOV if the trial court determines that, as a matter of law, the plaintiff's evidence is insufficient to permit the jury to find in her favor. (*Fillpoint, LLC v. Maas* (2012) 208 Cal.App.4th 1170, 1176 [nonsuit]; see also *Osborn, supra,* 5 Cal.App.4th at pp. 258–259 [same as to JNOV].)

II.    *Respondents Are Entitled to JNOV and / or nonsuit on Constructive Termination*

Because both JNOV and nonsuit are governed by the same standard, we review together the trial court's grant of JNOV (as to both respondents) and nonsuit (as to Rockport) on White's constructive termination claim.[5]  On independent review, we affirm both rulings.

---

[5]    Because the trial court deferred ruling on Rockport's motion for nonsuit regarding constructive termination until after the jury gave its verdict, White urges us to limit our review of that order to "whether . . . substantial evidence support[ed] the jury's conclusion."  But the authority White cites applies the de novo standard articulated above, and does not provide for a different standard in the event that nonsuit is granted after a jury verdict.  (See *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838; see also *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043,

A.    *Applicable law*

Constructive termination "occurs when the employer's conduct effectively forces an employee to resign." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244 (*Turner*).) An employer constructively terminates an employee when it "'deliberately causes or allows the employee's working conditions to become "so intolerable" that the employee is forced into an involuntary resignation.' [Citations.]" (*Smith v. Brown-Forman Distillers Corp.* (1987) 196 Cal.App.3d 503, 513 (*Smith*).)

To establish employer liability, an employee must demonstrate that her termination was not just constructive, but also wrongful because of "a breach of contract or tort in connection with employment termination[.]" (*Turner, supra*, 7 Cal.4th at p. 1251.) An employer may be liable in tort for a termination that was wrongfully caused by the employer's "demand that the employee commit a criminal act[.]" (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 178.)

To sustain this type of constructive termination claim, an employee "must prove that h[er] dismissal violated a policy that is," among other things, identifiable—in other words, a policy that is "embodied in a statute or constitutional provision." (*Turner, supra*, 7 Cal.4th at p. 1256; see also *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80 (*Green*) [expanding this prong to include policies embodied in "administrative regulations that serve [a] statutory objective"].)

---

fn. omitted ["It is axiomatic that cases are not authority for propositions that are not considered"].)

*B.    White's constructive termination claim fails as to Overland*

White's constructive termination claim alleged that her resignation was wrongful because Overland made her workplace intolerable by forcing her to participate in an unlawful scheme to defraud Medicare.  Her claim was properly subject to JNOV as to Overland because, at trial, White failed to present evidence that respondents compelled her to violate an identifiable fundamental public policy—i.e., a policy that is embodied in a constitutional provision, statute, or regulation.  (*Turner*, *supra*, 7 Cal.4th at p. 1256.)

Instead, White tethered her claim to ambiguous allegations that Overland forced her into their scheme to commit "MediCare fraud[,]" a term that was not defined for the jury.  The only source that the jury had to determine whether respondents rendered White an unwilling participant in "Medicare fraud" was White's testimony that, in her opinion, respondents' billing practices potentially involved her in an unspecified "federal crime that entitles federal jail time".[6]

As a matter of law, White's vague assertions that Overland compelled her to violate federal law cannot support her constructive termination claim.  (Compare *Turner*, *supra*, 7 Cal.4th at p. 1257 [granting an employer summary adjudication because the employee's "vague charge of 'Alcohol, Tobacco and Firearms laws' violations, largely unaccompanied by citations to specific statutory or constitutional provisions" were insufficient proof of constructive termination in violation of public policy]

---

[6]    As respondents point out, White never sought to qualify herself as a Medicare fraud expert.

with *Smith, supra*, 196 Cal.App.3d at pp. 510–512 [sufficient evidence supported the jury's constructive termination verdict where the employee alleged that his employer compelled him to violate specific provisions of the Federal Alcohol Administration Act, the California Alcoholic Beverage Control Act, and related regulations].)

We independently agree with the trial court's conclusion that White presented "[n]othing . . . to the jury to allow it to know the statute or other 'fundamental public policy' that was implicated" by her constructive termination claim. We thus affirm the order granting JNOV to Overland on constructive termination.

White raises what boil down to two counterarguments. First, she claims that "there was no requirement that 'MediCare fraud' be more specifically defined[.]" In support, she cites a criminal case which rejected a challenge to imprecise jury instructions, holding that it "is not necessary" to define "words in common use and of common knowledge" for the jury, including the word "'fraud[.]'" (*People v. Hardy* (1992) 2 Cal.4th 86, 153.)

White ignores that here, "fraud" is not necessarily the word in need of a definition; under the law of constructive termination in violation of public policy, she had to define what she meant by "MediCare." White needed to identify a specific law establishing requirements for preparing and/or submitting Medicare reimbursement forms, so that the jury could determine whether Overland fraudulently failed to comply with those requirements. Without reference to a specific law, the jury was put "in the position of having to guess at [the] nature of the public policies involved, if any." (*Turner, supra*, 7 Cal.4th at p. 1257.) As in *Turner*, this "failure to identify a statutory or constitutional

13

policy that would be thwarted by h[er] alleged discharge dooms [White's] cause of action." (*Ibid.*)

Second, White identifies a new source of public policy, which she never cited in the proceedings below: a 2000 report published by the Office of the Inspector General explaining the problems caused by fraudulent Medicare billing practices (the OIG report).[7] This belated proffer cannot help White defeat nonsuit or JNOV on appeal. Because the OIG report was not part of White's case at trial, it does not demonstrate that she submitted sufficient evidence "to permit a jury to find in [her] favor" on constructive termination. (*Fillpoint, supra*, 208 Cal.App.4th at p. 1176.)

Moreover, White fails to establish that the OIG report is a source of law capable of supporting a claim for constructive termination in violation of a public policy. (See *Green, supra*, 19 Cal.4th at p. 80 [limiting sources of fundamental public policy to constitutional provisions, statutes, and administrative regulations]; see also *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].)

---

[7] In her opening brief, White also writes that Overland's "actions were illegal" "because [they] violated the federal and state [F]alse [C]laims [A]cts." But in her reply brief, White retreats from that position, asserting that she "was not relying on a '[False Claims Act] theory'[] . . . at trial[.]" Following White's admission, we do not reach the parties' arguments about whether the False Claims Act (or its state analog) is a viable basis for her constructive termination claim.

14

C.     *White's constructive termination claim also fails as to Rockport*

White pursued an identical theory of liability for constructive termination as to both respondents.  Her claim against Rockport thus fails for the same reasons as against Overland, which we described above.[8]  Accordingly, we affirm the orders granting nonsuit and JNOV to Rockport on constructive termination.

III.    *Overland Is Entitled to Nonsuit on IIED*

A.     *Relevant law*

"The elements of a cause of action for [IIED] are (i) outrageous conduct by defendant, (ii) an intention by defendant to cause, or reckless disregard of the probability of causing, emotional distress, (iii) severe emotional distress, and (iv) an actual and proximate causal link between the tortious conduct and the emotional distress.  [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 300.)

To be outrageous, a defendant's conduct "'must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.'  [Citation.]  Generally, conduct will be found to be actionable where the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"' [Citation.]" (*KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028.)

---

[8]     Because we affirm nonsuit as to Rockport on this ground, we need not address the parties' alternative arguments, including whether Rockport was White's employer for purposes of constructive termination liability.

15

B.    *White's IIED claim fails*

The trial court properly granted nonsuit as to Overland on White's IIED claim because she did not prove that its conduct toward her was outrageous.

On appeal, White concedes that her emotional distress claim "relie[s] on the same outrageous conduct which was the basis for the constructive discharge cause of action." In other words, White alleges that Overland acted outrageously by requiring her acquiescence in what she considered to be Medicare fraud. This alone does not rise to the level of outrageousness required to support a claim for intentional infliction of emotional distress. (See *Garamendi v. Golden Eagle Ins. Co.* (2005) 128 Cal.App.4th 452, 480 [where an employee's "evidence demonstrated little more than that he had been told to keep quiet about his discoveries of fraud," the employer's "activity is insufficient to support a claim for intentional infliction of emotional distress"].)

White counters that a violation of statutory law in conscious disregard of a plaintiff's rights is necessarily outrageous. But the sole case White cites, *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004 (*Spinks*) does not support White's claim here. In *Spinks*, the reviewing court held a landlord's conduct could be considered outrageous when it unlawfully evicted the plaintiff by violating a specific statute "forbidding landlords from changing locks to terminate occupancy[,]" causing the plaintiff "to leave her home without benefit of judicial process." (*Spinks, supra*, at p. 1045.) The *Spinks* court also found significant that the plaintiff was left "particularly vulnerable" to the dangers of sudden eviction by a

16

recent surgery, which limited her mobility and left her unable to work. (*Id.* at p. 1046.)

Here, by contrast, White failed to identify a specific statute violated by Overland. Nor did she proffer evidence that she was especially "susceptible to emotional distress because of her physical or mental condition[.]" (*Spinks, supra,* 171 Cal.App.4th at p. 1046.) Accordingly, we affirm the order granting nonsuit to Overland on IIED.

IV.     *All Remaining Issues Are Moot*

Our affirmance of the trial court's orders granting nonsuit and/or JNOV on all claims for compensatory damages moots White's challenge to the order granting nonsuit on punitive damages. (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1137 ["A punitive damage claim depends upon a viable claim for compensatory damages for its vitality"].)

Similarly, because we affirm the grants of nonsuit and/or JNOV as to all claims involving Overland, the order granting alternative relief in the form of a new trial is moot. (Code Civ. Proc., § 629, subd. (d).)

17

## DISPOSITION

The orders are affirmed.  Respondents are entitled to costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
RICHARDSON

18