Stacy L. VOGAN, Plaintiff,

v.

US ONCOLOGY, INC., Missouri Cancer Associates, L.L.P., and Missouri Cancer Associates, L.L.C., Defendants.

No. 02–4207–CV–C–NKL.

United States District Court, W.D. Missouri, Central Division.

Oct. 30, 2003.

Michael G. Berry, Jefferson City, MO, for plaintiff.

Julianne Popper, Blackwell, Sanders, Peper, Martin, LLP–KCMO, Kansas City, MO, Matthew L. Hoeg, Andrews & Kurth, LLP, Houston, TX, Steven Martin Aaron, Blackwell, Sanders, Peper, Martin, Kansas City, MO, Thurston C. Bailey, Andrews & Kurth, LLP, Houston, TX, for defendants.

## ORDER

LAUGHREY, District Judge.

Pending before the Court is the Defendants' Motion for Summary Judgment [Doc. # 45]. For the reasons stated below, the motion will be denied.

### I. *Factual Background*

Solely for the purpose of the Defendants' Summary Judgment Motion, the Court views the facts in a light most favorable to the Plaintiff, accepting as true Plaintiff Stacy Vogan's ("Vogan") version of the facts when they are disputed.

■ In this lawsuit, Vogan claims the Defendants terminated her employment because of her pregnancy in violation of the Pregnancy Discrimination Act ("PDA") amendments to Title VII, 42 U.S.C. § 2000e, and the Missouri Human Rights Act.[1]

Vogan, the plaintiff, was the Clinical Research Coordinator for Missouri Cancer Associates, L.L.C. ("MCA"). Plaintiff contends that she was an employee of U.S. Oncology, Inc. ("USO"), as well. Richard Barker ("Barker") is employed by USO, but served as the Practice Administrator for MCA, and in that capacity provided some supervision to Vogan. Ken Baker ("Baker") works for USO as the Regional Director of Research. Robert Davis ("Davis") is USO's Regional Director of Human Resources. He administers MCA's employee benefit plans and employment policies. Dr. Joseph Muscato ("Muscato") is the physician in charge of the research program at MCA, but he is not an officer or technically an employee of MCA. Vogan worked under Muscato's direction as well. (*See* Barker Dep. at pp. 84–85.) Jacqueline Juenger ("Juenger") is an employee of Boone Hospital and Vogan's former supervisor when Vogan worked at Boone Hospital.

### A. Relationship Between MCA and USO

MCA is a Missouri limited liability company.[2] MCA provides oncology medical care to cancer patients.

USO is a corporation that is engaged in providing oncology medical care through-

---

1. MHRA claims are analyzed under the same standards as federal employment discrimination claims. *Fast v. Southern Union Co.,* 149 F.3d 885, 889 (8th Cir.1998).

2. Vogan sued MCA, L.L.P., and MCA, L.L.C. Defendant MCA, L.L.P., no longer exists as an active entity. It was succeeded in interest by MCA, L.L.C.

out the United States. One element of USO's business is managing and providing administrative, training, purchasing, and other services to entities that own and operate already existing oncology medical care facilities.

Since 1995, USO has provided management and administrative services to MCA according to a written service agreement. USO provides all of the non-clinical employees, such as billing clerks, receptionists, and human resources personnel, that work in MCA's offices. MCA employs all nurses and other clinical staff who provide direct patient care. The non-clinical employees provided by USO handle all administrative tasks of MCA, including: employee payroll services; employee benefits administration; drafting and publishing of employment policies, including the written leave of absence policy at issue in this case; employee benefits; answering employee questions about payroll or policies; monitoring the day-to-day business needs for MCA and the revenues and expenses of MCA; and managing MCA's central business office.

USO also handles employment issues involving requests for leaves of absence, hiring, termination, evaluation, transfers, pay changes, and facilitating communications between MCA departments. (Def. Ex. D (Barker Aff.) ¶ 3 ("I have been ultimately responsible for making employment decisions such as hiring, terminating, disciplining, and approving requests for leave of absence for non-physician employees of USO and MCA....").)

## B. Hiring Vogan

On August 14, 2001, Vogan was hired to the position of MCA's Clinical Research Coordinator. Muscato had input into hiring Vogan. Muscato interviewed Vogan and recommended her for the job over another candidate. According to him, his input was important. This is because he is the physician in charge of the research aspect of the practice. Muscato supervised Vogan's professional activities.

When Vogan first inquired about the position, she asked Muscato who she needed to talk to about the job. Muscato replied that he was in charge of the research and that she would need to talk to him. She met with only Muscato and the person she was replacing before she was hired.

## C. Vogan's Pregnancy

In October 2000, Vogan informed Barker that she was pregnant with twins. She told Barker she might need bed rest at twenty weeks. Barker responded in a supportive manner to Vogan's announcement:

Q: What was Rik's reaction when you told him—or Rik Barker's reaction when you told him?

A: He took it very well. He wasn't too upset or worried.

Q: Would you characterize his reaction as supportive?

A: I don't know that I can.

Yeah, for a supervisor, he was supportive.

(Vogan Dep. at pp. 35–36.)

In late January 2001, at twenty-two weeks into pregnancy, Vogan requested leave from Barker because she was placed on bed rest. She began her leave of absence on February 2, 2001.[3]

## D. Vogan's Replacement

Vogan discussed with Barker finding a temporary replacement for her position while she was on bed rest. Vogan posted

---

3. Because Vogan had been employed for less than one year, she was not eligible for leave under the federal Family and Medical Leave Act. She was eligible for leave under the company's written leave of absence policy.

the temporary position and interviewed candidates for it. Vogan recommended that her temporary replacement be Lisa Atkins ("Atkins"). Atkins was officially assigned to the Clinical Research Coordinator position in March 2001.

### E. Discriminatory Statement

Juenger testified that she heard a statement made by Muscato discussing Vogan's upcoming absence. She heard him say, "I guess I should not be hiring women into that position or at least not one with a uterus." (Juenger Dep. at pp. 10–12.) Juenger recalls that Muscato made this statement to a group of people at a nurse's station at Boone Hospital. Juenger has known Muscato for six years and she has never before or since heard him make any similar statements.

### F. Termination

The Defendants' leave of absence policy provides that a leave may not exceed ninety days unless additional time for special circumstances was approved by the Regional Vice President. (Def. Ex. E at p. 5.) Vogan states that she did not know of the ninety day limit on her leave when she first began her leave. (Vogan Dep. at p. 68.)

On April 2, 2001, Davis wrote Vogan a letter stating that her leave of absence would run through April 30, 2001, and that she would be expected to return to work by that day. This was the first time Vogan learned of the ninety day restriction on her leave. In this letter, Davis informed Vogan that she should and could reapply for employment if she were terminated and later wanted to return to work. (Def.Ex. K.) The letter did not mention the special circumstances provision. (Def.Ex. K.)

Vogan did not return to work on or before April 30, 2001. On May 1, 2001, Barker[4] notified Vogan that she was "terminated from employment at Missouri Cancer Associates/US Oncology effective today, May 1, 2001." (Def.Ex. L.) Vogan's twins were born on April 26, 2001, four days before the Defendants officially discharged Vogan.

## II. *Summary Judgment Standard*

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir.1991) (citation omitted). The main purpose of a motion for summary judgment is to identify factually unsupported claims. If a plaintiff has the burden of proof at trial on a claim and the defendant has filed a motion for summary judgment, the plaintiff must identify admissible evidence suffi-

---

**4.** There is a dispute in the testimony between Barker and Davis as to who ultimately made the decision to terminate Vogan. Barker asserts that he sent Vogan's termination letter at Davis' direction. (Barker Dep. at p. 84.)

Davis states that the decision was Barker's and that it is the decision of the medical practice whether to grant disability leaves beyond ninety days. (Davis Dep. at pp. 37–38.)

cient to make a submissible case at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the plaintiff cannot identify such facts, the defendant is entitled to judgment as a matter of law. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

### III. *Discussion*

#### A. Is USO Vogan's "Employer"?

Under Title VII, an employer is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1).

An "employee" is defined as an individual employed by an employer. 42 U.S.C. § 2000e(f). An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b).

■ Both of those definitions are met in this case. Neither party disputes that Vogan is an employee. Therefore, this is not the situation addressed in *Wilde v. County*

*of Kandiyohi,* 15 F.3d 103 (8th Cir.1994), where the Eighth Circuit had to decide whether someone was an employee or an independent contractor. Likewise, USO is clearly an employer because it has fifteen or more employees and is engaged in an industry affecting commerce. The question is whether Vogan must be an employee of USO before it can be liable under Title VII. The answer is no. If USO interfered with Vogan's employment in contravention of Title VII, USO can be liable even though it did not directly employ Vogan. *Hunt v. Missouri Dep't of Corr.,* 119 F.Supp.2d 996, 1001–02 (W.D.Mo. 2000). Also, a person may be deemed an employee of two or more employers under some circumstances. *Hunt v. Missouri Dep't of Corr.,* 297 F.3d 735, 742 (8th Cir. 2002).

Vogan was under the supervision and scrutiny of USO officials and employees. At least some of Vogan's immediate supervisors were USO employees. Vogan was paid by USO. USO administered all employee benefits for Vogan. USO drafted and published all of the employment policies, including the policy at issue in this case. USO answered all of Vogan's questions related to employee payroll, policies, and any human resources question. It was both USO and MCA personnel that participated in the hiring of Vogan. USO wrote the letters to Vogan informing her of the leave of absence policy and the letter that terminated Vogan.[5] In the letters, the Defendants referred to Vogan's employment by "Missouri Cancer Associates/US Oncology" (Def.Ex. L) and with "US Oncology" (Def.Ex. K). The Defendants assert numerous times it was only USO that made the decision to terminate Vogan. A reasonable fact finder could

---

**5.** USO also generally handled evaluations, transfers, and pay changes for clinical and non-clinical staff. It is unclear from the record whether Vogan was ever evaluated, transferred, or given a pay increase or decrease.

conclude that Vogan was an employee for both MCA and USO since USO asserted an employer's control over Vogan.[6]

## B. Direct v. Circumstantial Evidence of Discrimination

■ Vogan and Defendants have spent considerable effort debating whether there is "direct" evidence of discrimination in this record. However, after the U.S. Supreme Court's Opinion in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the distinction between direct and circumstantial evidence has evaporated. In that case, the Supreme Court held that 42 U.S.C. § 2000e–2(m) does not require direct evidence of discrimination. A plaintiff need only show, by direct or circumstantial evidence, that defendant has engaged in a forbidden employment practice.

■ The full import of *Desert Palace, Inc.*, is not yet clear, but it is settled that if an adverse employment action was motivated because of plaintiff's race, gender, pregnancy, etc., even in part, a plaintiff is entitled to judgment, at least on the issue of liability. Thus, the focus should be on all evidence that supports a finding in this case that Vogan's termination was motivated in part because of her pregnancy. What is not clear is the continuing validity of the *McDonnell Douglas Corp.* burden-shifting paradigm at the summary judgment stage. *See Allen v. City of Pocahontas*, 340 F.3d 551 (8th Cir.2003); *Dare v. Wal–Mart Stores, Inc.*, 267 F.Supp.2d 987 (D.Minn.2003); *Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.*, 285 F.Supp.2d 1180 (N.D.Iowa 2003); *Griffith v. City of*

*Des Moines*, —— F.Supp.2d ——, 2003 WL 21976027 (S.D.Iowa July 3, 2003); *cf. Davis v. Emery Worldwide Corp.*, 267 F.Supp.2d 109, 120 n. 2 (D.Me.2003). While this Court seriously questions the continued viability of the *McDonnell Douglas* burden-shifting paradigm, it will use it to analyze this case because the outcome would be the same whether it is used or not used at the summary judgment stage.

## C. *McDonnell Douglas* Burden–Shifting Analysis

Vogan argues that she has met the three-stage burden-shifting paradigm first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, Vogan must first establish a prima facie case of gender discrimination. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir.2002). If Vogan satisfies these initial burdens, the burden then shifts to the Defendants to rebut the prima facie case by articulating legitimate, nondiscriminatory reasons for terminating Vogan. *Id.* If the case reaches that stage, Vogan then assumes the burden of producing evidence that the proffered reason was merely a pretext for discrimination. *Williams v. Saint Luke's–Shawnee Mission Health Sys., Inc.*, 276 F.3d 1057, 1059 (8th Cir. 2002).

To establish a prima facie showing of gender discrimination, Vogan must show that: (1) she belonged to a protected class, (2) she was qualified to receive the benefit at issue (a leave of absence longer than ninety days); (3) she was denied the benefit; (4) and the same benefit was available to others with similar qualifications.[7] *Lang*

---

**6.** The Court believes this is a fact question to be addressed by the Court after hearing evidence at trial and prior to submission of this matter to a jury. This issue will be resolved at a future time.

**7.** Without discussion, the Defendants and the Plaintiff disagree on the fourth element of the

prima facie case. Vogan states that it is "whether her discharge occurred in circumstances that create an inference of unlawful discrimination," which can be established by evidence that a member outside of the protected class was hired to refill the position. Vogan has obviously established this since her

*v. Star Herald,* 107 F.3d 1308, 1311 (8th Cir.1997).

At issue in this case is the fourth element of the prima facie case: was the benefit of a leave of absence longer than ninety days available to others with similar qualifications? The Defendants argue that other individuals who were similarly situated were not given the benefit of a longer absence. According to Barker, he is "unaware" of anyone at MCA that ever remained on a leave of absence for more than ninety days. (Barker Dep. at pp. 73–74.) As for employees of other USO affiliated clinics, the Defendants argue the employees are not similarly situated for purposes of comparison.

Barker, however, never discussed the leave of absence policy with Vogan prior to her leaving. Furthermore, Barker said he never discussed with Vogan that her leave of absence could be extended beyond the ninety days in special circumstances. (Barker Dep. at pp. 72–73.) Barker never gave her a copy of the leave of absence policy. (Barker Dep. at pp. 72–73.) Barker and Davis never discussed the possibility of whether Vogan's complications with her pregnancy might qualify as a special circumstance. (Barker Dep. at p. 73.)

■ Five other employees of USO affiliated clinics within Davis' region[8] have been permitted to take a leave of absence in excess of ninety days and then return to work. Two of the individuals took leaves for non-pregnancy related reasons. These employees were connected to USO in a manner similar to Vogan's connection to MCA. They all worked for affiliated clinics, were governed by the same USO policies, were subject to Davis' interpretations regarding the employment procedures, and were subject to Davis' final decision whether to grant leave in excess of ninety days (Davis Dep. at p. 37). This is sufficient evidence for a reasonable jury to conclude that Vogan met her burden as to the fourth element of her prima facie case.

The Defendants argue that because the other five employees were not affiliated with MCA and were employed in different states, Vogan cannot use them to establish that the Defendants treated similarly situated employees more favorably than her. Yet, Vogan is using the evidence of other employees to meet the fourth element of her prima facie case—that the benefit was available to others with similar qualifications. The case law the Defendants cite while arguing that a rigorous comparison must be made all discuss another situation: when a party is using the similarly situated employees to prove pretext. This is not the situation here. The evidence is being used to meet her prima facie burden, which requires much less evidence than a showing of pretext. *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 726 (8th Cir.2001) ("[T]he prima facie case requires only a minimal showing, while a showing of pretext requires more substantial evidence.").

Next, the Defendants put forth the legitimate, non-discriminatory reason of MCA's enforcement of a leave of absence policy. Vogan now has the burden of producing evidence that the proffered reason was a pretext for discrimination.

■ Vogan argues that she has evidence of a discriminatory motive through Muscato's discriminatory comment. The Defendants assert that Muscato's comment was

replacement, Atkins, was beyond normal childbearing age. The Defendants state the fourth element is whether "she was treated differently than similarly situated, non-pregnant employees." The Court follows the Eighth Circuit's statement of the elements in PDA claims.

8. The country is divided into three regions, Davis' region is the central region.

a single, stray comment by someone uninvolved in the decision making process.

Yet, Vogan presents evidence that suggests Muscato had more participation in the decision making process than the Defendants have testified. Muscato was involved in hiring Vogan—Vogan only interviewed with Muscato and the person she was replacing. His input into hiring her and anyone into the research coordinator position was important. Muscato was the physician responsible for the research department that she coordinated, and he supervised Vogan's professional activities. He participated in decisions regarding employee status. He was active in the process of replacing Vogan. Furthermore, the Defendants are even unclear about how the decision to terminate Vogan was made. It appears that both of the primary decision makers believe the other person made the final decision. Moreover, USO would not extend a leave for special circumstances without the approval of MCA, and a reasonable juror could find that Muscato would be involved in any such decision given his role at MCA. Finally, Muscato's statement was in close proximity to Vogan's termination. From Vogan's evidence, a reasonable jury could conclude that the Defendants' proffered reason is a pretext for illegal discrimination and that her pregnancy played a part in her termination in violation of Title VII.

## V. *Conclusion*

Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment [Doc. # 45] is DENIED.