# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-3490/01-1834

_____

| | | |
|---|---|---|
| Rebecca Hunt, Susan Nurnberg, | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| State of Missouri, Department | * | Western District of Missouri |
| of Corrections, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  November 14, 2001

Filed:  July 22, 2002

_____

Before McMILLIAN, FAGG and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

The State of Missouri, Department of Corrections ("DOC"), appeals from (1) a final judgment entered in the United States District Court[1] for the Western District of Missouri upon a jury verdict in favor of Rebecca Hunt and Susan Nurnberg (together

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

"plaintiffs") on their Title VII retaliation claims against DOC,[2] <u>Hunt v. Missouri Dep't of Corrections</u>, No. 99-4158-CV-C-5 (W.D. Mo. Sept. 18, 2000) (<u>Hunt</u>) (judgment), and (2) an order of the district court awarding plaintiffs $136,967.50 in attorneys' fees, <u>see</u> <u>id.</u> (Mar. 5, 2001) (hereinafter "Attorneys' Fees Order"). For reversal, DOC argues that the district court: (1) erred in holding that plaintiffs have standing to sue DOC under Title VII; (2) erred in holding that DOC is not protected by Eleventh Amendment immunity in the present case; (3) erred in holding that the evidence was sufficient to support the jury's verdict; and (4) abused its discretion in awarding plaintiffs attorneys' fees. For the reasons discussed below, we affirm the judgment of the district court and its award of attorneys' fees.

Jurisdiction in the district court was proper based upon 28 U.S.C. § 1331. Jurisdiction in this court is proper based upon 28 U.S.C. § 1291. The notices of appeal were timely filed pursuant to Fed. R. App. P. 4(a).

## Background

Plaintiffs brought this Title VII action in the district court against DOC and Favorite Nurses, Inc. ("Favorite Nurses"), a temporary staffing agency. Plaintiffs settled with Favorite Nurses, leaving DOC as the sole defendant. DOC moved for summary judgment, arguing, among other things, that at all relevant times plaintiffs were employees of Favorite Nurses, and *not* of DOC, and plaintiffs therefore lacked standing to sue DOC under the terms of Title VII. Upon consideration, the district court held that, because plaintiffs each met the statutory definition of "employee," and DOC met the statutory definition of "employer," plaintiffs did have standing to sue DOC under Title VII. <u>See</u> <u>Hunt</u>, slip op. at 9-13 (Aug. 30, 2000) (hereinafter

---

[2]Plaintiffs also brought Title VII sexual harassment claims against DOC. The jury's verdict was in favor of DOC on those claims. <u>See</u> Joint Appendix, Vol. II, at 349 (verdict forms).

"Summary Judgment Order") (citing Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338 (D.C. Cir. 1973) (Sibley) (holding that suit could be maintained under Title VII where the plaintiff was not a direct employee of the defendant, but the plaintiff met the statutory definition of an "employee," the defendant met the statutory definition of an "employer," and the plaintiff alleged that the defendant had unlawfully discriminated against him with respect to the privileges of his employment)). Noting that plaintiffs were at least employed by Favorite Nurses, the district court declined at that time to decide whether plaintiffs were also employed by DOC. See id. at 13 & n.3 ("Because the Court finds that Sibley is applicable to this case, the Court does not address the question whether the Plaintiffs were in fact dual employees of Favorite Nurses and [DOC].").

The case proceeded to trial. The evidence presented at trial showed the following. Prior to the summer of 1997, Nurnberg, a registered nurse, worked for the Cole County, Missouri, Health Department. In that capacity, she met Julie Ives, the Director of Nursing for DOC. In the summer of 1997, shortly after Nurnberg had left her job with Cole County, Ives contacted Nurnberg about an employment opportunity with DOC. During the summer of 1997, Nurnberg worked for DOC and was paid directly by DOC. Ives told Nurnberg that she was setting up a new employee health unit at the Jefferson City Correctional Center (JCCC) and asked Nurnberg to staff it. Nurnberg agreed. At Ives' request, Nurnberg contacted Hunt, also a registered nurse, to ask her to work at the employee health unit at JCCC. Hunt also agreed. Ives informed each of them that Favorite Nurses, a temporary staffing agency, would act as a contracting agency and would pay them directly. DOC could not pay the nurses directly because the state legislature had not authorized the new positions. Nurnberg and Hunt each spoke with a representative of Favorite Nurses on the telephone.

Plaintiffs began working in the employee health unit at JCCC on December 8, 1997. DOC owned the clinic at JCCC where plaintiffs reported to work each day, supplied the materials plaintiffs used in the clinic, was responsible for establishing

plaintiffs' work procedures, provided plaintiffs with all doctor protocols, and made decisions about plaintiffs' work hours and work duties. Favorite Nurses paid plaintiffs, but was reimbursed by DOC.

Problems immediately arose between plaintiffs and two DOC employees in the Fire & Safety Department at JCCC, Rodney Perry and Mitchell Seaman, who had supervisory authority over plaintiffs. Plaintiffs complained to Ives that Perry and Seaman were "shadowing" them, engaging in lewd behavior, and frequently making comments of a sexual nature. Ives spoke with Perry and Seaman about plaintiffs' complaints. Perry became angry and hostile toward plaintiffs, particularly Nurnberg.

Problems between plaintiffs and Perry and Seaman continued. For example, Perry and Seaman refused to provide plaintiffs with incident and accident reports, employee health records, and doctor protocols – all of which were necessary for plaintiffs to perform their jobs. When plaintiffs again complained to Ives about Perry and Seaman, specifically describing the problem as sexual harassment, Ives warned them not to file a formal complaint and told them that they would be "pulled" if they could not get along with Perry and Seaman. When plaintiffs met with other DOC officials, including Dave Dormire and Jerry Curtitt, they were repeatedly told that they needed to get along better.

In the spring of 1998, plaintiffs complained to the DOC Human Resources Department (HR). They met with Debra Clay Harris in HR, but never heard from her again after the meeting. Next, they contacted Alma McKinney in HR. At a meeting between plaintiffs and McKinney, plaintiffs specifically described the problem as sexual harassment, which should have triggered an investigation, but McKinney insisted on referring to Perry's and Seaman's conduct as "unprofessional behavior." Plaintiffs never heard back from McKinney either. Meanwhile, the problems plaintiffs were experiencing with Perry and Seaman persisted. On one occasion, Perry ordered Nurnberg to perform an HIV blood test without a doctor's order. When

-4-

she refused, Perry became very angry. When she reported the problem to Ives, Ives told her not to make such a big deal of it. On another occasion, Perry refused to give plaintiffs filter masks before seeing a patient who was a known tuberculosis carrier.

In April of 1998, Dave Williams, an investigator at JCCC, came into the clinic for a tuberculosis test. Plaintiffs told him about the problems they were having. He and his supervisor, Arthur Dearixon, began processing formal complaints and started an investigation. Williams contacted McKinney, who told him that she had talked with plaintiffs. When Williams and Dearixon completed their initial report, they forwarded it to Dormire. They recommended interviews of Dormire and Harris and further investigation. Dormire reacted by suggesting to plaintiffs that they would face counter-charges and that their lives would become a "living hell." Shortly thereafter, Perry and Seaman sent memos to Dormire claiming that plaintiffs had lied. Dormire forwarded the memos to Dearixon and urged him to initiate an investigation of plaintiffs, but Dearixon declined. Around the same time, Ives gave plaintiffs a new work schedule which included, for example, a 5:30 a.m. start time for Nurnberg, who had a young daughter in school. After Nurnberg complained and alleged the work schedule was retaliatory, the schedule was changed back. In addition, plaintiffs were required to have their time sheets signed by a particular associate superintendent who could rarely be found, and they were required to sign in and out every time they left the building. Individuals such as Dormire also began closely monitoring plaintiffs' activity.

Based upon the initial report prepared by Williams and Dearixon, a follow-up investigation and report were completed by Ed Robinson, at the direction of Ercell Grimes, the DOC Inspector General. Grimes sent Robinson's report to Dora Schriro, Director of DOC, along with his own findings. Based upon Robinson's report, Grimes found that Perry and Seaman had engaged in offensive conduct but not unequivocal sexual harassment, and that management should have responded more quickly. He also found that Perry, Seaman, and Ives had each been deceptive in

answering questions. George Lombardi, the DOC Director of Adult Institutions, recommended that Dormire, Curtitt, Perry, and Seaman each be cautioned or reprimanded and that Curtitt, Perry, and Seaman be required to undergo sexual harassment training. None of these recommended actions were taken, even after Dormire was ordered to issue letters of caution and arrange for sexual harassment training. Afterward, Dormire and Ives began asking individuals to sign a petition purportedly showing that the signatories were unable to see a nurse on particular dates, at particular times. This campaign was reported to plaintiffs by a coworker. Hunt resigned on June 30, 1998, and Nurnberg resigned on July 10, 1998.

The jury returned a verdict for DOC on plaintiffs' Title VII sexual harassment claims, but found for plaintiffs on their Title VII retaliation claims. See Joint Appendix, Vol. II, at 349 (jury verdict forms). The jury awarded Hunt $31,712.09 in lost wages and benefits and $25,000 in non-economic damages and awarded Nurnberg $61,023.91 in lost wages and benefits and $25,000 in non-economic damages.

DOC moved for judgment as a matter of law (JAML) or for a new trial, arguing, among other things, that: (1) the evidence at trial was insufficient as a matter of law to support a finding of an adverse employment action as an element of plaintiffs' retaliation claims and (2) DOC was protected by Eleventh Amendment immunity to the extent the district court was relying on Sibley and its progeny as the basis for subject matter jurisdiction. Upon review of the motion for JAML, the district court concluded, in light of the evidence presented at trial, that (1) the evidence was legally sufficient to support the jury's finding that plaintiffs had each suffered an adverse employment action – namely, intolerable working conditions, see Hunt, slip op. at 6 (Jan. 23, 2001) (hereinafter "JAML Order") ("Having listened to both of the Plaintiffs' testimony, the Court finds it sufficient to support the jury's finding that both Plaintiffs' working conditions were intolerable"), and (2) DOC's Eleventh Amendment immunity argument failed because plaintiffs were, in fact,

employees of DOC. See id. at 18 ("Having heard the testimony at trial, the Court concludes that the Plaintiffs were dual employees of [DOC] and Favorite Nurses."). Following the district court's entry of judgment upon the jury verdict, DOC timely filed a notice of appeal.

Plaintiffs moved for an award of attorneys' fees and for additional injunctive relief under the district court's equitable powers. The district court denied plaintiffs' request for additional equitable relief, but awarded plaintiffs attorneys' fees. DOC timely filed a second notice of appeal from the district court's attorneys' fees decision. DOC's two appeals were consolidated and are now before this court.

**Discussion**

Standing

DOC first argues that the district court erred in holding that plaintiffs had standing to bring their Title VII claims against it. DOC maintains that plaintiffs were employees of Favorite Nurses and only independent contractors of DOC. Regarding the district court's determination that plaintiffs were employed by both Favorite Nurses and DOC, DOC asserts that neither the Supreme Court nor the Eighth Circuit has recognized the concept of "dual employment" in the Title VII context and, moreover, that the concept is inconsistent with the well-established rule that independent contractors are not employees and therefore lack standing under Title VII. Even if Title VII standing may be based upon "dual employment" status, DOC continues, it was clear error for the district court to find that plaintiffs were, in fact, dual employees of DOC and Favorite Nurses. DOC contends that the evidence in the present case clearly established that plaintiffs were not in a direct, traditional master-servant relationship with DOC. Rather, DOC argues, Favorite Nurses assigned plaintiffs to the positions at JCCC subject only to DOC's approval, and plaintiffs themselves made "independent decisions regarding their day-to-day work involving

-7-

JCCC employees' medical issues." Brief for Appellant at 29. DOC also emphasizes that it did nothing to help plaintiffs become skilled or licensed, plaintiffs worked at JCCC for only about eight months, DOC is not in the business of providing healthcare services, and DOC did not hire plaintiffs as "employees," but instead contracted for Favorite Nurses to provide nurses to work at JCCC. DOC further challenges the district court's reasoning at the summary judgment stage that subject matter jurisdiction could be based upon Sibley and its progeny, which have recognized that, under appropriate circumstances, a plaintiff-employee may sue a defendant-employer under Title VII, even though the plaintiff was not the direct employee of the defendant. That view, DOC argues, has been rejected by the Supreme Court's "adoption of a presumption that Congress means an agency law definition of 'employee' unless it clearly indicates otherwise." Id. at 12 (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 325 (1992) (Darden)).

On appeal, we review the district court's determination of employment status *de novo*, and we review the district court's underlying factual findings for clear error. Schwieger v. Farm Bureau Ins. Co., 207 F.3d 480, 484 (8th Cir. 2000) (Schwieger); cf. Berger Transfer & Storage v. Central States, Southeast & Southwest Areas Pension Fund, 85 F.3d 1374, 1377 (8th Cir. 1996) (Berger Transfer) (adopting same standards in Fair Labor Standards Act case).

The law is well established that Title VII protects employees, not independent contractors, from discriminatory employment practices. See Schwieger, 207 F.3d at 483 (citing Wilde v. County of Kandiyohi, 15 F.3d 103, 104 (8th Cir. 1994) (Wilde)). In Schwieger, we observed that Title VII's "nominal definition of an 'employee' as 'an individual employed by an employer,' 42 U.S.C. § 2000e(f), 'is completely circular and explains nothing.'" Id. (quoting Darden, 503 U.S. at 323). We thus reasoned that Congress must have intended the term to be read according to the common law agency definition. See id. Determining whether a party is an employee or an independent contractor, we explained, requires a fact-intensive consideration

of "'all aspects of the working relationship' between the parties." Id. (quoting Wilde, 15 F.3d at 106). Moreover, while the right to control the manner and means by which tasks are accomplished is a primary consideration, no single factor is decisive. See id. at 483-84. In Schwieger, we also discussed twelve specific factors identified in Darden as relevant to this inquiry, but we then went on to caution that the list of factors is nonexhaustive and the inquiry must take into account the "economic realities" of the worker's situation. Id. at 484. Notably, we specifically cautioned that "[t]he existence of a contract referring to a party as an independent contractor does not end the inquiry, because an employer 'may not avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship.'" Id. at 483 (quoting Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81 (8th Cir. 1996), cert. denied, 520 U.S. 1211 (1997)). Applying the analysis set forth in Schwieger and similar precedents, we now hold that the district court did not err in concluding, based upon the control exercised by others over the terms and conditions of plaintiffs' work, that at all relevant times plaintiffs worked at JCCC as employees rather than as independent contractors.

We now turn to DOC's argument that plaintiffs could not have been employees of both Favorite Nurses and DOC, for purposes of conferring standing to sue under Title VII. We disagree. To begin, nothing in the law precludes the possibility that a person may have two or more employers for the same work. In the present case, the undisputed fact that plaintiffs were employed by Favorite Nurses for the work they were doing at JCCC was a factor to be considered by the district court in assessing plaintiffs' employment status vis-a-vis DOC, but it was not the decisive factor. In reaching the conclusion that plaintiffs had sufficiently demonstrated that they were employees, as opposed to independent contractors, the district court noted the following:

> Plaintiffs were initially contacted, interviewed, and hired by Ives, a
> [DOC] employee. The premises, tools, and instrumentalities of the

Plaintiffs' work were exclusively controlled by [DOC]. Plaintiffs were forced to rely on [DOC] employees, including Ives, Perry, and Seaman, for nursing protocols, employee files, accident/incident reports, and other information necessary to perform their jobs. Plaintiffs were also forced to rely on [DOC] employees to sign-off on their timecards. Finally, there are allegations that Dormire pressured the Plaintiffs to retract their complaints by warning them that the complaints were damaging the employee nurse program. This "warning" can be interpreted as a threat to the existence of the program, and with it, the Plaintiffs' jobs, evidencing the obvious control that [DOC] exercised over Plaintiffs' employment opportunities.

Id. at 12-13.[3] In other words, in deciding at the summary judgment stage that plaintiffs were employees at least of Favorite Nurses, the district court relied upon the control over plaintiffs' working terms and conditions exercised by DOC, not Favorite Nurses. Later, in denying DOC's motion for JAML, the district court made specific findings regarding how DOC employees not only controlled plaintiffs' working conditions, but also made them intolerable. See JAML Order at 4-6. Thus, when the district court made the post-trial finding that plaintiffs were employees of DOC as well as Favorite Nurses, it did not "reverse course" as DOC now argues, but rather, made a finding that was entirely consistent with its findings at the summary judgment stage and with the evidence presented at trial. Indeed, contrary to DOC's arguments on appeal, the evidence at trial showed that plaintiffs did not work independently and that they were constantly under the supervision and scrutiny of DOC officials and employees. Furthermore, while plaintiffs were directly paid by Favorite Nurses, they did no work for Favorite Nurses other than the JCCC work. It was DOC that hired them, determined their work duties and schedules, provided the tools and supplies

_____

[3]As explained above, when DOC first challenged plaintiffs' standing to sue under Title VII in its motion for summary judgment, the district court declined to reach the question of whether plaintiffs were DOC employees because the district court, at that time, was only relying on Sibley and its progeny and considered it sufficient that plaintiffs were, at a minimum, employees of Favorite Nurses.

of their work, provided (and sometimes withheld) the doctors' orders they needed to do their jobs, determined and ultimately paid their salaries, and threatened to fire them if they did not get along better with other DOC employees. Thus, upon review, we hold that the district court did not err in ultimately concluding that plaintiffs were employees of DOC at all relevant times and therefore had standing to sue DOC under Title VII.[4]

Eleventh Amendment immunity

Related to its standing argument, DOC argues that the district court erred in rejecting its assertion of Eleventh Amendment immunity to plaintiffs' Title VII claims. DOC acknowledges that, in 1972, Congress acted within its constitutional authority under § 5 of the 14th Amendment when it clearly and unequivocally amended Title VII to allow state and local government employees to bring Title VII claims against their governmental employers. See, e.g., Fitzpatrick v. Bitzer, 427 U.S. 445 (1976); Okruhlik v. University of Arkansas, 255 F.3d 615 (8th Cir. 2001). However, DOC argues, Congress did not unequivocally express an intent to abrogate Eleventh Amendment immunity for Title VII claims brought against governmental employers by persons who are not actual employees.

DOC's Eleventh Amendment argument rests upon the assumption that plaintiffs were not employees of DOC. As we have already held that the district court did not err in concluding that plaintiffs were employees of DOC, we hold that the district court likewise did not err in concluding that DOC is not protected by Eleventh Amendment immunity in the present case.

---

[4]In light of our holding that the district court did not err in determining that plaintiffs were employees of DOC, we need not review the district court's alternative ground for holding that plaintiffs had standing to sue DOC under Title VII, which was based upon the reasoning and holding in Sibley and its progeny.

Sufficiency of the evidence

DOC next argues that the district court erred in denying its post-trial motion for judgment as a matter of law based upon insufficiency of the evidence. Specifically, DOC contends that plaintiffs did not prove that they were subjected to any adverse actions materially affecting the terms or conditions of their employment. Therefore, DOC contends, plaintiffs failed as a matter of law to prove a constructive discharge, an essential element of their retaliation claim. DOC maintains that, even viewing the evidence in the light most favorable to plaintiffs and giving plaintiffs the benefit of all reasonable inferences, the evidence at most establishes that plaintiffs were merely ostracized, scrutinized, and presented with an unsatisfactory work schedule which was never actually implemented – none of which suffices to establish a constructive discharge. See, e.g., Summit v. S-B Power Tool, 121 F.3d 416, 421 (8th Cir. 1997) (affirming JAML for the defendant-employer for insufficiency of the evidence to prove a constructive discharge where the evidence showed that, although the plaintiff-employee had been transferred to a second shift with temporary employees and defective parts, her stress was caused largely by her own performance problems and not by sex discrimination), cert. denied, 523 U.S. 1004 (1998); Hanenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 575 (8th Cir. 1997) (affirming summary judgment for the defendant-employer on a constructive discharge claim where the evidence would show, at most, that the plaintiff-employee was subjected to heightened scrutiny making the job less enjoyable and more stressful, but not intolerable).

We review the record as a whole, drawing all reasonable inferences in favor of plaintiffs as the nonmoving parties.[5] The question before us is whether there was "a

_____

[5]DOC argues that the facts regarding the allegations of sexual harassment are not relevant to the issues on appeal and, in any event, should be viewed in the light most favorable to DOC as the prevailing party on plaintiffs' sexual harassment claims. See Reply Brief for Appellant at 1 (citing Morse v. Southern Union Co., 174

complete absence of probative facts" supporting plaintiffs' position, such that no reasonable juror could have found that they had been constructively discharged from their jobs. Ogden v. Wax Works, Inc., 214 F.3d 999, 1005-06 (8th Cir. 2000). "A constructive discharge occurs when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate her employment." Henderson v. Simmons Foods, Inc., 217 F.3d 612, 617 (8th Cir. 2000).

As the district court explained, the evidence in the present case reasonably established that plaintiffs' complaints about the manner in which they were being treated by Perry and Seaman were not met with any meaningful support, but were instead answered with threats to their well-being, threats of termination, efforts to obstruct their work, additional unnecessary and unreasonable job requirements, and general harassment. Indeed, when an internal investigation of plaintiffs' complaints resulted in a directive to Dormire to discipline and require sexual harassment training for several DOC employees, including Perry and Seaman, he simply did nothing. In sum, the evidence viewed in the proper light reasonably supports the conclusion that DOC, through its action and inaction, rendered plaintiffs' working conditions so intolerable that they were left with no choice but to terminate their employment. See JAML Order at 4-5. We therefore hold that the evidence was legally sufficient to support the jury's verdict, including the finding that plaintiffs were constructively discharged.

---

F.3d 917, 924 (8th Cir.), cert. dismissed, 527 U.S. 1059 (1999)). We disagree. DOC is appealing from the district court's denial of its post-trial motion for judgment as a matter of law on plaintiffs' retaliation claims. "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In so doing, however, the court must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." Id.

Attorneys' fees

        Finally, DOC argues that the district court abused its discretion in awarding plaintiffs attorneys' fees. DOC argues that the documentation plaintiffs submitted in support of their request was not sufficiently detailed, the hours billed were excessive and redundant, and some of the fees requested and awarded were for work done on matters unrelated to plaintiffs' successful claims against DOC. DOC particularly highlights the entries where plaintiffs' attorneys billed an unusually high number of hours in a single day.

        To the extent DOC presented the same arguments in the district court, the district court carefully considered and rejected them. See Attorneys' Fees Order at 6-8. The district court determined that the billing entries submitted by plaintiffs' attorneys were sufficiently detailed to support their requests for fees. For example, for each day – including those on which an unusually large number of hours were billed – plaintiffs' records listed not just the number of hours expended but also the various tasks performed by each attorney in that day. See id. at 6-7. The district court also reasoned that the hours for which plaintiffs' attorneys sought reimbursement were reasonably expended. For instance, the days with an unusually large number of billed hours generally correlated with the days on which multiple depositions were taken or the case was in trial. See id. As to DOC's assertion that some of the fees were not related to plaintiffs' successful claims, the district court carefully reviewed the bills submitted and appropriately concluded that the hours for which reimbursement was requested were "reasonable in relation to the result obtained." Id. at 7-8. Upon review of the record and the parties' arguments on appeal, we hold that the district court did not abuse its discretion in awarding attorneys' fees in the present case.

## Conclusion

For the reasons stated, the judgment of the district court and the award of attorneys' fees are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.