#24164-a-DG

**2007 SD 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

CHAD ANDERSON,                                    Plaintiff and Appellant,

  v.

FIRST CENTURY FEDERAL
CREDIT UNION,                                    Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE STUART L. TIEDE
Judge

\* \* \* \*

MEREDITH A. MOORE
MICHAEL D. BORNITZ of
Cutler & Donahoe, LLP
Sioux Falls, South Dakota                    Attorneys for plaintiff
                                       and appellant.

MELANIE CARPENTER
GARY P. THIMSEN of
Woods, Fuller, Shultz & Smith
Sioux Falls, South Dakota                    Attorneys for defendant
                                       and appellee.

\* \* \* \*

ARGUED FEBRUARY 14, 2007

OPINION FILED **07/03/07**

#24164

GILBERTSON, Chief Justice

[¶1.]     On September 22, 2004, Chad Anderson (Anderson) filed suit in the South Dakota Second Judicial Circuit against First Century Federal Credit Union (hereinafter referred to as either "First Century" or the "credit union") in connection with cessation of his employment. On April 28, 2006, First Century filed a motion for summary judgment. On June 14, 2006, the circuit court issued its memorandum opinion granting First Century's motion. The circuit court's order of dismissal and summary judgment were entered on June 19, 2006.

## FACTS AND PROCEDURE

[¶2.]     The material events leading up to the cessation of Anderson's employment with First Century are essentially undisputed. Anderson was employed as executive vice president of First Century, the second highest position at the credit union. In January 2002, Judy Wickre (Wickre), head teller and operations manager for First Century, confronted Anderson about unusual activity involving the personal accounts of First Century's president and CEO, Jill Handel (Handel) and her boyfriend Jarrod Haacke (Haacke). Wickre observed that late-night, large, even-dollar-amount drafts and ATM withdrawals were being drawn on the accounts. She also noted that tens of thousands of dollars at a time were coming into and going out of the accounts. Anderson and Wickre began to monitor the activity and eventually concluded that Handel, who they suspected had a gambling problem, was taking out loans in the names of other individuals and then depositing the proceeds in accounts belonging to Haacke and her. The two suspected that Handel was taking out the loans in the names of her two sons, a

-1-

daughter-in-law and her father, and then refinancing them to conceal delinquencies.

[¶3.] Anderson and Wickre withheld notification to First Century's board of directors of the suspicious activity involving the accounts of Handel and Haacke, anticipating that it would be exposed during an upcoming annual National Credit Union Administration (NCUA)[1] audit. However, the NCUA's May on-site audit, which focused on commercial rather than personal accounts, failed to uncover the activity. Anderson and Wickre then revealed the information about Handel and Haacke's accounts to First Century vice president of operations, Matt Perry (Perry). Perry concurred with Anderson and Wickre's assessment that Handel appeared to be complicit in wrongdoing.

[¶4.] On or about May 22, 2002, Anderson and Wickre went to the home of Lee Thompson (Thompson), chairman of the board of directors for First Century, to report their concerns about Handel. Anderson brought a prepared copy of his letter of resignation to the meeting with Thompson in order to show that he was not motivated by a desire to assume Handel's position, but rather a genuine concern for the credit union and its members. During this meeting, Anderson and Wickre did not reveal *in toto* the information they had obtained, limiting the disclosure of names and account activity to that of Handel. Thompson told Anderson he would

---

1. The NCUA is the federal agency that charters and supervises federal credit unions and insures savings in federal and most state-chartered credit unions across the country through the National Credit Union Share Insurance Fund, a federal fund backed by the full faith and credit of the United States government. www.ncua.gov (last visited January 25, 2007).

look into the situation and assured Anderson and Wickre that in bringing the information to his attention they "did the right thing."

[¶5.]     Between the date of this meeting and the middle of June 2002, Anderson called Thompson on two occasions to check on the status of Thompson's investigation. On each occasion Anderson reiterated his willingness to resign if necessary to demonstrate that he was genuinely concerned about the well-being of the credit union and not simply angling for Handel's job. During each of these conversations Thompson reassured Anderson that he was looking into the matter.

[¶6.]     Cognizant of the recent NCUA audit, Thompson contacted the examiner who had conducted the review, Larry Wirt, to discuss the allegations against Handel. Wirt was dismissive of the claims. He also told Thompson that the allegations as reported did not justify a further review from the NCUA's perspective.

[¶7.]     Thompson then contacted Warren Anderson, the board's supervisory committee chairman. However, Anderson had just resigned from the First Century board of directors due to his recent appointment to the position of United States Marshall. The two were therefore unable to discuss the matter. Thompson did not contact other past or present First Century board members at this time concerning the allegations involving Handel.

[¶8.]     In addition to the NCUA, First Century's accounting firm, Eide-Bailly, had also conducted its annual outside audit of the credit union's operations. Thompson contacted Roger Terveen, the Eide-Bailly auditor who had conducted the review. During his deposition, Thompson stated that when he asked Terveen whether he had noticed anything unusual about the account activity of any First

Century officers, Terveen indicated that although fraud detection had not been the focus of the audit, he had not found anything of concern during his review.

[¶9.] On or about June 20, 2002, Thompson contacted Anderson and informed him that he would need the identity of the other individuals whose names were being used in Handel's alleged scheme in order to facilitate continued investigation. Anderson printed out account information for Handel, Haacke, and Handel's sons, daughter-in-law and father. This information was then placed in an envelope and on June 20, 2002, was delivered by Wickre to Thompson at his place of business. Thompson, who at the time was meeting with a customer, placed the envelope in a drawer. Thompson left town later that day and did not open the envelope until July 1, 2002, following his return home.

[¶10.] On Monday, July 1, 2002, at 7:00 a.m., Anderson was preparing for his first day back to work after a vacation when he received a call from Thompson. Thompson informed Anderson that on June 28, 2002, Handel had apparently heard from First Century staff that Anderson, Perry and Wickre had raised allegations about her with Thompson, had disseminated personal account information to him, and that the trio were commenting that Handel's "head would roll." Handel had taken this information to another First Century board member, Cecilia Grunewaldt, who in turn contacted board member Dick DeVaney. The two had then confronted Thompson about his knowledge of the allegations and account information.

[¶11.] Through this juncture, while Anderson, Perry and Wickre had observed that Handel had become noticeably aloof and ill-tempered at work, her

-4-

irascibleness was not specifically directed at the trio.[2] Also, Anderson acknowledged that no one with First Century told Anderson that he should not have reported his suspicions about Handel and no one at First Century retaliated against Anderson for doing so. At no time following the discovery of Handel's suspicious account activities did anyone associated with First Century, including Handel and Thompson, tell him to resign or that he was going to be terminated, demoted or disciplined. Further, no one lead Anderson to believe that his job was in jeopardy.[3]

[¶12.]    During the July 1, 2002, telephone call, Thompson informed Anderson that the First Century board of directors was going to meet later that day to discuss the allegations Anderson, Perry and Wickre had made against Handel. Anderson once again offered up his resignation stating to Thompson, "Well, what am I supposed to do? I'm not going to put up with this another day. I'm not going to work for her, and things are going but nothing has been done. Where can I go with this? I'm not going to be fired."[4] Thompson then told Anderson, "You do what you think you have to do."

---

2.    During his deposition Perry stated everyone in the credit union felt the tension in the workplace.

3.    Handel actually gave Anderson a favorable performance review in June 2002.

4.    During his deposition, while discussing the events surrounding the July 1, 2002, phone call with Thompson, Anderson engaged in the following exchange when questioned about whether he was in fear of loosing his own job upon hearing from Thompson that morning:

      A: I guess I wasn't [in fear of loosing my job].
      Q: You just said you were.

(continued . . .)

[¶13.] Before leaving for the credit union, Anderson called Perry to advise him that Handel and other members of the board of directors besides Thompson were now aware of their allegations. When Anderson arrived at the credit union, he walked into Handel's office and tendered his resignation. Handel asked him to reconsider and at least hold off on making a decision until the board of directors had met. Anderson refused her request, packed his things and left. Later that same morning Perry submitted his resignation to Handel as well. Handel implored him to stay.[5] Perry rejected her request, but agreed to stay through the end of the week to assist with transition. Following the board of directors meeting, Wickre was dismissed by Handel for carrying documents off the premises in violation of credit union policy.[6]

[¶14.] As a result of the allegations against Handel, raised by Anderson, Perry and Wickre, the First Century board of directors voted during the July 1,

---

(. . . continued)

    A: Well, I guess I was thinking we were finally going to get to the bottom of [Handel's suspicious activities] here that week.

5. In recounting the episode during his deposition, Perry stated:

    [Handel] started crying. She said, "You don't need to resign." She made a comment, "Yes, maybe I have been gambling a little, but if you notice, I quit two or three weeks ago." I said that I still felt I needed to. She cried some more, requested that I stay on.

6. The documents that were the subject of Wickre's dismissal were those that included the account information Wickre delivered to Thompson's place of business on June 20. A point of contention between Anderson and Thompson has been whether, as claimed by Thompson, he requested only the names of those that Handel was using in the alleged scheme or whether in addition he requested delivery of the account information associated with the names.

2002 meeting to hire Eide-Bailly to conduct another audit. In addition, after the cessation of their employment with First Century, Anderson and Perry filed a suspicious activity report with the NCUA prompting the regulatory agency to conduct an on-cite investigation into their allegations in November 2002.[7] Ultimately, Handel was terminated by First Century in December 2002.

[¶15.] Anderson filed a suit against First Century for wrongful discharge and intentional infliction of emotional distress on September 22, 2004. On April 28, 2006, First Century filed a motion for summary judgment. On June 14, 2006, the circuit court granted First Century's motion, dismissing Anderson's claims.

[¶16.] Anderson appeals raising the following issues:

1.  Whether the circuit court erred in granting First Century's motion for summary judgment as to Anderson's claim of wrongful discharge based on constructive discharge.

2.  Whether the circuit court erred in granting First Century's motion for summary judgment as to Anderson's claim of intentional infliction of emotional distress.

### STANDARD OF REVIEW

In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. The non-moving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine

---

7.  In addition to the NCUA, the FBI came to the credit union to conduct their own investigation of potential fraudulent activity involving Handel.

issue of material fact exists and whether the law was correctly applied.  If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

Pickering v. Pickering, 434 NW2d 758, 760-61 (SD 1989) (internal citations omitted).

## ANALYSIS AND DECISION

[¶17.]    **1.    Whether the circuit court erred in granting First Century's motion for summary judgment as to Anderson's claim of wrongful discharge based on constructive discharge.**

*"At-will" Employment and the Public Policy Exception*

[¶18.]    In South Dakota, employment without a specified term is on an "at-will" basis for which employment can be terminated with or without cause by notice of either party.  SDCL 60-4-4.  This Court has recognized exceptions to this doctrine where an "at-will" termination is contrary to public policy.  *See* Johnson v. Kreiser's, Inc., 433 NW2d 225, 227 (SD 1988) (holding that an employee who was discharged in retaliation for refusal to commit an unlawful act could state a cause of action for wrongful termination); Niesent v. Homestake Min. Co. of California, 505 NW2d 781, 784 (SD 1993) (holding that the public policy exception to the "at-will" employment doctrine includes a cause of action for wrongful termination where the discharge is in retaliation for filing a workers' compensation claim).

[¶19.]    In *Dahl v. Combined Ins. Co.*, 2001 SD 12, 621 NW2d 163, we acknowledged that "whistleblowing," or the reporting of criminal or unlawful activity to superiors or outside agencies, plays an invaluable role in society.  *Id*. ¶12, 621 NW2d at 167.  While noting that other courts have recognized that

employees should not be deterred, but rather encouraged to report unlawful workplace activity if acting in good faith with probable cause, *id.* (citing Palmateer v. International Harvester Co., 421 NE2d 876, 880 (Ill 1981); Wagner v. City of Globe, 722 P2d 250, 257 (Ariz 1986)), we held "that only whistleblowing which promotes the public good is protected by the public policy exception." *Id.* ¶12, 621 NW2d at 167. First Century concedes, and for purposes of this analysis we will assume, that Anderson acted not out of any self-serving motivation, but rather in good faith as a whistleblower acting out of concern for the credit union and its members. Though criminal charges were never filed against Handel,[8] ultimately the First Century board of directors commissioned a second audit to review the suspect accounts and two federal agencies conducted on-site investigations when apprised of Anderson's allegations. Thus, we will also assume for this analysis that Anderson had sufficient reason to believe Handel was conducting criminal or wrongful activity.

*The Wrongful Discharged Claim*

[¶20.] Since Anderson voluntarily resigned from his position with First Century, his wrongful discharge claim is based on a theory of constructive discharge. Anderson claims that he believed his work environment at First Century was intolerable because of his knowledge of suspicious account activity involving Handel and the tense atmosphere she was creating. He further claims that he put

---

8. For the record, Handel died in a June 2003 propane explosion at the home she shared with Haacke in Crooks, SD. John-John Williams, *Cut Line Caused Explosion: cable installers damaged pipe; propane leaked into house*, S.F. Argus Leader, June 5, 2003, § B, p1, col 2.

First Century on notice as to Handel's suspicious activity and that the credit union failed to take adequate corrective action. Consequently, Anderson contends he had no hope that the intolerable work environs would be rectified and that he was thus left with no alternative but to resign, which First Century should have reasonably foreseen. Anderson also bases his claim that he was forced to resign on his belief that he would have been terminated on July 1, 2002, due to the allegations he had raised against Handel. Though Anderson indicated in his deposition testimony that he did not at the time believe he was about to be fired, Anderson now asserts that the July 1, 2002, revelation that Handel was aware that he had reported his suspicions about her to Thompson, placed him in fear for his employment. Coupling what he considered to be Thompson's withdrawal of support and his perceived eminent termination with his knowledge of Handel's activities and his own belief that his continued employment with First Century under the circumstances constituted tacit approval of Handel's actions, Anderson argues that he had no alternative but to resign, thus, constituting wrongful discharge on a theory of constructive discharge.

[¶21.]     This Court has not previously considered the merits of a wrongful discharge or termination based on the theory of constructive discharge. Therefore, it is instructive to examine case law from the federal courts and other jurisdictions.

[¶22.]     "An employee has been constructively discharged 'when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate [his] employment.'" Turner v. Honeywell Federal Mfg. & Technologies, LLC, 336 F3d 716, 724 (8thCir 2003) (quoting Hunt v. Missouri, Dep't of Corrections, 297 F3d 735, 744 (8thCir 2002)

(citing Henderson v. Simmons Foods, Inc., 217 F3d 612, 617 (8thCir 2000))). Thus, a constructive discharge theory of liability allows an employee to sue for wrongful discharge even after the employee voluntarily resigns. MacGregor v. Mallinckrodt, Inc., 373 F3d 923, 928 (8thCir 2004) (citing Tidwell v. Meyer's Bakeries, Inc., 93 F3d 490, 494 (8thCir 1996)).

[¶23.]    The court in *Phillips v. Taco Bell Corp.*, 156 F3d 884 (8thCir 1998), set out a standard for assessing constructive discharge claims:

> Constructive discharge occurs "when an employer deliberately renders the employee's working conditions intolerable and thus forces [her] to quit [her] job." Johnson v. Bunny Bread Co., 646 F2d 1250, 1256 (8thCir 1981). *See also* Bergstrom-Ek v. Best Oil Co., 153 F3d 851 (8thCir 1998). The employer's actions must have been intended to force the employee to quit, meaning the employee's resignation must be a reasonably foreseeable consequence of the employer's discriminatory actions. Allen v. Bridgestone/Firestone, Inc., 81 F3d 793, 796 (8thCir 1996) (citing Hukkanen v. International Union of Operating Engineers, 3 F3d 281, 285 (8thCir 1993)). *See also* Tidwell v. Meyer's Bakeries, Inc., 93 F3d 490, 494 (8thCir 1996) ("To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit."). In addition, to prove she has been constructively [discharged], a plaintiff must demonstrate that a reasonable person would find the working conditions intolerable. *Allen,* 81 F3d at 796. Such intolerability of working conditions is judged by an objective standard, not the plaintiff's subjective feelings. *Id.* Finally, to be reasonable "'an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged.'" Summit v. S-B Power Tool, 121 F3d 416, 421 (8thCir 1997) (quoting *Tidwell,* 93 F3d at 494). *See also* Coffman v. Tracker Marine, L.P., 141 F3d 1241, 1247 (8thCir 1998).

*Id.* at 890.

[¶24.]     While Anderson may have believed that the conditions of his employment were intolerable, this is not the standard by which intolerability is determined. *See Phillips,* 156 F3d at 890 (citing *Allen,* 81 F3d at 796 (stating an objective standard by which the intolerability of employment conditions are assessed for purposes of establishing constructive discharge)); *see also* Bristow v. Daily Press, Inc., 770 F2d 1251, 1255 (4thCir 1985), *cert. denied,* 475 US 1082, 106 SCt 1461, 89 LEd2d 718 (1986) (recognizing that the law does not permit an employee's subjective perceptions to underlie a claim of constructive discharge because to do otherwise would be to enable an employee to base such a claim on unreasonable sensitivity to his work environs) (citation omitted). In the instant case, the undisputed material facts do not objectively evince the intolerable working conditions that must be present to establish constructive discharge.

[¶25.]     As evident from decisions in other jurisdictions, Anderson's belief that his knowledge of Handel's alleged wrongful activities coupled with his view that he was demonstrating tacit approval of her actions by his continued employment[9] does not evince the intolerable working conditions required to establish constructive discharge. In *Turner v. Anheuser-Busch, Inc.*, 876 P2d 1022 (Cal 1994), the court considered the constructive discharge claim of an employee/whistleblower who reported the illegal activities of co-workers. The employee argued that the presence

---

9.     Anderson's view that his continued employment at First Century constituted tacit approval of Handel's activities is untenable in light of his well-documented efforts to bring her activity to the attention of the highest echelons of the credit union prior to his resignation.

of illegal activity in the workplace was enough to constitute an intolerable work condition. *Id*. at 1031. In rejecting this argument, the court stated:

> The mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee. Turner was not requested, let alone required, to participate in any of the illegal conduct he complains of.

*Id*. at 1032. *See also* Strozinsky v. School Dist. of Brown Deer, 614 NW2d 443, 464 (Wisc 2000) (citing *Turner* acknowledging that "the mere presence of illegal conduct at the workplace does not render the environment intolerable"). However, intolerable conditions may arise when an employer requests or requires an employee to take part in illegal activity. *Strozinsky*, 614 NW2d at 464 (citing Smith v. Brown-Forman Distillers Corp., 241 CalRptr 916 (CalApp3d 1987); *Turner*, 876 P2d at 1032)). In the instant case, assuming for the sake of argument that Handel's suspicious account activity amounted to illegal conduct, Anderson never alleges that anyone associated with First Century attempted to recruit him to conduct illegal activity.

[¶26.]     Anderson also attempts to base his claim that the work environment at First Century was intolerable on his contention that during the time in question Handel's demeanor created tension for him at the credit union. However, that any ill-temperament on Handel's part was directed specifically at Anderson cannot be gleaned from the record. Quite to the contrary, Handel gave Anderson a favorable performance review in June 2002, less than one month prior to his resignation. It is also apparent that Handel was not aware that Anderson had reported his allegations about her to Thompson until June 28, 2002—three days before

Anderson's resignation. Furthermore, Anderson's fellow whistleblower, Perry, stated that to the extent there was tension in the workplace emanating from Handel, it was felt by all.

[¶27.] In *Goldsmith v. Mayor and City Council of Baltimore*, 987 F2d 1064 (4thCir 1993), an employee claimed constructive discharge arising from her reporting of alleged fiscal irregularities within a city government. *Id.* at 1067. In dismissing the employee's assertion that the defendant had retaliated by subjecting her to an intolerable work atmosphere, the court noted:

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. *An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions,* **in excess of those faced by his co-workers**. He is not, however, guaranteed a working environment free of stress.

*Id.* at 1072 (quoting *Bristow,* 770 F2d at 1255, *cert. denied,* 475 US 1082, 106 SCt 1461, 89 LEd2d 718) (emphasis added). Relating this rationale to the instant case, we note that Anderson was unable to show that Handel singled him out for ill-treatment. If anything, the record reflects nothing more than a general atmosphere of tension, for which all at the credit union were exposed. Therefore, Anderson's assertion that the work environment at the credit union was intolerable falls short.

[¶28.] There is also nothing in the record to indicate that First Century did anything deliberate in an attempt to render Anderson's working conditions intolerable. *See Phillips,* 156 F3d at 890 (quoting *Johnson,* 646 F2d at 1256; citing *Allen,* 81 F3d 793, 796) (recognizing that to establish constructive discharge the employer must act with an intent to force the employee to quit). Anderson alleges

no condemnations, threats or reprisals of any kind arising out of his disclosure of Handel's activities. No one with First Century told Anderson that he should not have reported his suspicions about Handel. No one told him to resign or that he was going to be terminated, demoted or disciplined. In short, no one, on First Century's behalf, retaliated against Anderson in any way for reporting his concerns about Handel.

[¶29.] Unable to show that anyone associated with or on behalf of First Century carried out any affirmative acts of retribution against him, Anderson argues that Thompson, on notice of Handel's suspicious activities, failed to conduct an adequate investigation of Handel with the foreseeable consequence that Anderson would resign.[10] *Phillips,* 156 F3d at 890 (citing *Allen*, 81 F3d 793, 796); *see also* Kimzey v. Wal-Mart Stores, Inc., 107 F3d 568, 574 (8thCir 1995) (citing Winbush v. State of Iowa by Glenwood State Hosp., 66 F3d 1471, 1485 (8thCir 1995)) (recognizing that there is constructive discharge when an employee quits due to a reasonable belief that there is no chance for fair treatment). In fact, Anderson suggests that having received the report of Handel's activities, Thompson did nothing. *Phillips,* 156 F3d at 890 (citing *Summit*, 121 F3d at 421 (quoting *Tidwell,* 93 F3d at 494 (holding that an employee, to have a reasonable basis to pursue a

---

10. Anderson argues that his resignation was a foreseeable outcome of his alleged intolerable work environs because he offered it on each occasion that he spoke to Thompson after and during his disclosure of the allegations against Handel. However, this is at odds with his assertion and earlier deposition testimony that his pre-July 1, 2002, offers to resign were intended to demonstrate that he was acting as a bona fide "whistleblower" and not merely out of a motivation to assume Handel's job.

constructive discharge claim, must not "assume the worst [or] jump to conclusions too quickly"))). A review of the record reveals that this suggestion is fallacious.

[¶30.]	Thompson did not have four months to ponder Handel's account activities as did Anderson and Wickre. Notwithstanding the reason they chose to sit on that information from January 2002 until they informed Thompson on or about May 22, 2002, the end result was that Thompson was hit cold with serious allegations of misconduct involving Handel—the trusted president and CEO of First Century with over twenty years of employment history at the credit union.[11]

[¶31.]	Though it is unclear exactly what Anderson expected Thompson to do, it is clear that Thompson took the reasonably prudent steps that anyone in his position would have under the circumstances. Thompson contacted NCUA examiner, Wirt, to discuss the allegations. Wirt, who had just conducted the agency's on-site audit of the bank, left Thompson with the impression that the allegations were without merit and not of concern.[12] Still, Thompson took additional steps in an attempt to confirm the veracity of the allegations against Handel. Thompson contacted Warren Anderson to discuss the issue, but was

---

11.	During his deposition, Thompson stated that Handel had been employed by First Century for over twenty-one years. She became president and CEO of the credit union in 1994. During her tenure as senior officer, she guided First Century through a successful turn-around following a bankruptcy that the credit union had entered before she became president and CEO. Thompson also indicated that Handel was well respected in the credit union industry and that she had a great rapport with the First Century membership.

12.	During his deposition, Thompson indicated that Wirt, in addition to stating that further NCUA review would not be required, responded to the allegations by stating "I think you may just have a disgruntled employee."

unaware that he had recently resigned from the First Century board of directors and thus was unable to discuss the matter. He then contacted Eide-Bailly auditor, Terveen. Terveen, who had also conducted a recent on-site audit of the credit union, uncovered no suspicious employee account activity during his review.

[¶32.]     Rather than dispensing with the matter at this point, Thompson, in an effort to continue the inquiry, contacted Anderson to request the identities of others that Handel had been using in her alleged scheme. Anderson and Wickre had knowledge of these identities, but had chosen not to divulge them earlier to Thompson. The two finally delivered this information to him on June 20, 2002—almost a full month after Thompson was apprised of Anderson and Wickre's allegations. Unfortunately, Thompson, a volunteer director for First Century, was unable at that time to review the additional information because he was leaving town that same day.

[¶33.]     Although Thompson did not initiate a contact with other current First Century directors to discuss the allegations against Handel, on June 28, 2002, the matter did come to the attention of Thompson's fellow directors, Grunewaldt and DeVaney. A special meeting of the First Century board of directors was scheduled for July 1, 2002, exactly for the purpose of considering the allegations against Handel. Incredibly, upon hearing this news Anderson resigned stating, "I'm not going to put up with this another day." In fact, if Anderson had put up with *it* for one more day, he would have found that the board of directors, on the strength of his allegations, decided at the special meeting to ask Eide-Bailly to come back and conduct a second audit—this time to review specific account activity.

[¶34.] Anderson argues that he gave First Century a reasonable chance to rectify the problems he perceived at the credit union. *See Phillips,* 156 F3d at 890 (citing *Summit,* 121 F3d at 421 (quoting *Tidwell,* 93 F3d at 494 (holding that there is no constructive discharge where an employee fails to give an employer a reasonable chance to rectify a problem before resigning))). Anderson avers that given this reasonable chance to address his concerns, Thompson, on behalf of First Century, conducted a wholly inadequate investigation and failed to keep him informed as to any progress. *But see Coffman,* 141 F3d at 1247 (holding that a former employee, claiming constructive discharge, had no right to dictate the manner in which her employer sought to rectify the problem leading to her resignation). However, where Anderson had four months to consider Handel's account activity, Thompson had little more than five weeks from May 22, 2002, to verify the allegations against Handel of which he was previously unaware. Further, Anderson complicated Thompson's inquiry by providing him piecemeal information relevant to the inquiry. Finally, Anderson gave his resignation on the very day that the entire First Century board met to consider his allegations against Handel and decided to commission an audit to look into the same. Viewed in a light most favorable to Anderson, First Century did not have a reasonable opportunity to investigate the allegations against Handel and take corrective action.

[¶35.] Anderson's assertion that he was about to be terminated for his allegations against Handel, thereby justifying his July1, 2002, resignation and claim of constructive discharge, is also unsupported by the facts. Anderson's assertion that his termination was imminent is mainly attributable to his belief

that Thompson's July 1, 2002, statement, "You do what you think you have to do" made in response to his threat of resignation, constituted a withdrawal of Thompson's support. Anderson's assertion is simply not born out by the facts. First, rather than dismissing Anderson's allegations, the First Century board of directors decided to have another audit conducted to look into the suspect accounts. Second, Handel asked Anderson to reconsider his resignation prior to the board of directors meeting. A tearful Handel even went so far as to plead with Anderson's fellow whistleblower, Perry, to reconsider his own resignation. Third, Anderson points to Wickre's dismissal by Handel, following the directors' meeting, as evidence that he too was about to be fired. However, Wickre's dismissal did not occur until after Anderson's resignation and Wickre's dismissal was a for-cause termination for taking account information off the credit union premises in violation of First Century policy. Finally, Anderson's own deposition testimony belies his assertion that he was about to be terminated. *See note* 4, *supra* (indicating Anderson did not believe on July 1, 2002, that he was about to be terminated).

[¶36.] Our review of tort law establishes that the claim of constructive discharge has been generally applied in cases where intolerable work environs arise out of sexual harassment and various types of discrimination. On appeal, Anderson asks us for a holding that would constitute a radical departure from established law on constructive discharge. We decline his request. Viewed in a light most favorable to Anderson, we find no genuine issues as to material facts nor error in the circuit court's application of relevant law to those facts. We, therefore, find no basis to

reverse the circuit court's grant of First Century's motion for summary judgment as to Anderson's wrongful discharge claim based on constructive discharge.

[¶37.]     **2.     Whether the circuit court erred in granting First Century's motion for summary judgment as to Anderson's claim of intentional infliction of emotional distress.**

[¶38.]     In South Dakota a prima facie case of intentional infliction of emotional distress requires the plaintiff to make a showing of the following elements:  (1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause the plaintiff severe emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's distress; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.  Nelson v. WEB Water Dev. Ass'n, Inc. 507 NW2d 691, 698 (SD 1993) (citing Tibke v. McDougal, 479 NW2d 898 (SD 1992) (citations omitted)).

[¶39.]     As born out in the analysis of the first issue, there is no evidence that First Century carried out any extreme or outrageous acts against Anderson.  There is absolutely no evidence in the record to indicate that First Century had any intention to cause Anderson severe emotional distress.  Anderson does allude to various conditions including difficulty sleeping, irritability, a general feeling that he was not well and high blood pressure.  However, his only evidence that these conditions were caused by First Century is the inconclusive deposition statement of his doctor, upon learning that he was experiencing stress at work, that work stress

can cause high blood pressure.[13] Finally, Anderson's conditions are no more than ordinary and do not rise to the level necessary to sustain a claim of intentional infliction of emotional distress. Accordingly, the circuit court did not err in granting First Century's motion for summary judgment as to Anderson's claim of intentional infliction of emotional distress.

[¶40.]    Affirmed.

[¶41.]    KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

[¶42.]    SABERS, Justice, dissents.

SABERS, Justice (dissenting).

[¶43.]    The trial court erred in granting summary judgment. Summary judgment is a harsh remedy that rarely should be granted. Hieb v. Lehrkamp, 2005 SD 98, ¶45, 704 NW2d 875, 889-90 (Sabers, J., dissenting) (noting summary judgment is an extreme remedy only to be used "when the truth is clear"); Richards v. Lenz, 539 NW2d 80, 83 (SD 1995) ("Summary judgment is a drastic remedy, and should not be granted unless the moving party has established a right to a judgment with such clarity as to leave no room for controversy."). It is not a substitute for a trial. Piner v. Jensen, 519 NW2d 337, 339 (SD 1994) (citing Dahl v. Sittner, 429 NW2d 458, 461 (SD 1988)). The court may not grant summary judgment simply because it believes the plaintiff's case will not succeed at trial. Wulf v. Senst, 2003 SD 105, ¶17, 669 NW2d 135, 141.

---

13.    We note that Anderson failed to include his doctor's deposition testimony in the record and thus we would not in any event consider references to such in deciding this case.

[¶44.] In a constructive discharge case, summary judgment should only be granted if there is "a complete absence of probative facts supporting plaintiffs' position, such that no reasonable juror could have found that they had been constructively discharged . . . ." Ogden v. Wax Works, Inc., 214 F3d 999, 1005-06 (8thCir 2000). Furthermore, summary judgment should rarely be granted in the area of discrimination. Crawford v. Runyon, 37 F3d 1338, 1341 (8thCir 1994). "Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." Id.

[¶45.] In this case, the circuit court granted summary judgment despite the existence of genuine issues of material fact. In granting summary judgment, the court erroneously viewed the evidence in the light most favorable to First Century, instead of Anderson. All evidence and reasonable inference derived from it should be viewed in the light most favorable to the non-moving party. St. Onge Livestock Company, Ltd., v. Curtis, 2002 SD 102, ¶10, 650 NW2d 537 (quoting Mueller v. Cedar Shore Resort, Inc., 2002 SD 38, ¶10, 643 NW2d 56, 61-62); St. Paul Fire & Marine Ins. Co., v. Engelmann, 2002 SD 8, ¶15, 639 NW2d 192, 199 ("Not only must the facts not be in issue, but also there must be no genuine issue on the inferences to be drawn from those facts."). If the evidence is viewed using the proper standard, then we should reverse because there are genuine issues of material fact that a jury should decide.

[¶46.] Constructive discharge occurs "when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee

essentially is forced to terminate [his] employment." Turner v. Honeywell Fed. Mfg. & Tech., L.L.C., 336 F2d 716, 724 (8thCir 2003) (additional citations omitted). A constructive discharge can occur if the employee "reasonably believes there is no chance for fair treatment . . . ." Kimzey v. Wal-Mart Stores, Inc., 107 F3d 568, 574 (8thCir 1997). Anderson alleged sufficient facts for a reasonable jury to conclude that he was faced with an intolerable work environment and that First Century failed to conduct a prompt and adequate investigation to remedy the problem. Anderson reported Handel's suspicious loan activity to Board member Thompson. Anderson claims Thompson did not take prompt and adequate corrective action. He alleges that Thompson only made phone calls to account examiners and asked them if any problems were noticed during the audits. However, the audits conducted in the past were insufficient to discover these specific allegations against Handel. Moreover, Thompson did not alert any other board member, did not speak with Handel or anyone else at First Century regarding the allegations, nor did he open the documents Anderson provided until July 1, 2002.

[¶47.] During the course of Thomson's "investigation" Anderson was kept in the dark and had to continue working for Handel. There was testimony the office environment was "intense." Anderson had to worry the company would think he was angling for Handel's job, disbelieve his intentions and fire him. This was not over a couple days, but over a six week period. There is evidence that Handel and others knew of Anderson's allegations and had informed other board members that he was conspiring against her to get her job.

[¶48.] There is evidence Anderson thought he could be fired. He testified Thompson told him, "heads were going to roll" and "s**t was going to hit the fan."

While he testified that it was Handel's head that was going to roll, he later indicated that he panicked and thought the head that was going to roll could have been his own. Whether his fear of "being fired" and of "having his head roll" were reasonable are genuine issues of material fact for the jury, not the judge. The jury should be allowed to weigh the evidence and testimony in order to determine whether Anderson reasonably suffered from an intolerable work environment and feared for his job.

[¶49.] Furthermore, when he asked for assurances and support from Thompson regarding his job and potentially resigning, Thompson replied "You do what you gotta do. Just tell her why." Deposition of Anderson, p. 30, lines 5-25; p. 31, lines 1-3, Anderson v. First Century Fed. Credit Union, (No. 24164). There are several sufficient facts that, if viewed in the light most favorable to Anderson, create genuine issues of material fact for the jury to decide.

[¶50.] Instead of viewing the facts in the light most favorable to Anderson, the circuit court decided genuine issues of material fact against Anderson. The circuit court concluded that absent direct threats of termination, Anderson should have waited for termination. It also stated that Anderson should have waited longer before resigning or waiting until the board meeting on July 1, 2002. Furthermore, it noted that it believed Anderson was angling for Handel's job. The circuit court noted:

> I just don't understand why he didn't wait. What was the harm for waiting one more day to find out what the Board was going to do? State his case. Then find out whether or not there really was an intimidating work environment there or whether or not he was going [to] have the support of the Board. Certainly nothing that Mr. Thompson had done up to that point had

> indicated in any way, shape, or form that he was going to hang Mr. Anderson out to dry.

Brief of Appellant, p. 13, *Anderson* (No. 04-2192) (quoting Transcript of Summary Judgment hearing p. 29-30). These findings were made by viewing the facts in the light most favorable to First Century, not to Anderson as required. In fact, the circuit court erred in making findings favorable to First Century during summary judgment.

[¶51.] The jury should determine the ultimate question – whether Anderson was subject to constructive discharge. The jury should determine whether Anderson's work environment was so intolerable that a *reasonable* person in that employee's position would have felt compelled to resign. It is the function of the jury to determine whether Anderson's actions were reasonable. This case should be reversed and remanded in order for the jury to determine the questions of fact.